PIEDMONT INSTITUTE OF PAIN MANAGEMENT, T. STUART MELOY, M.D., NANCY T. FALLER, D.O., AND WILLIAM JOSEPH MARTIN, D.O., PLAINTIFFS v. STATON FOUNDATION AND PHILLIP A.R. STATON, IN HIS INDIVIDUAL CAPACITY AND IN HIS REP-RESENTATIVE CAPACITY AS TRUSTEE OF THE STATON FOUNDATION, DEFENDANTS

PIEDMONT INSTITUTE OF PAIN MANAGEMENT, T. STUART MELOY, M.D., NANCY T. FALLER, D.O., AND WILLIAM JOSEPH MARTIN, D.O., PLAINTIFFS v. CENTURA BANK, POYNER & SPRUILL, AND POYNER & SPRUILL, L.L.P., DEFENDANTS

No. COA02-147

(Filed 20 May 2003)

**1. Compromise and Settlement— breach of funding agreement—settlement agreement—validity—breach of fiduciary duty—fraud—negligent misrepresentation**

A settlement agreement entered in an action by plaintiff pain clinic and its doctors against defendant charitable trust and foundation and its trustee for breach of contract to fund the pain clinic was not executed by plaintiffs as a result of breach of fiduciary duty, fraud or negligent misrepresentation and was binding and enforceable, because: (1) even if a fiduciary duty did exist between defendant trustee and plaintiffs, this fiduciary duty had been repudiated before settlement negotiations began, the parties were adversaries and all were represented by counsel, and defendant trustee had no duty to disclose to plaintiffs the existence of any documentation, including powers of attorney signed by him, that supported plaintiffs' claims to funding; (2) plaintiffs' fraud claim was barred by the statute of limitations because it was filed more than three years after they had the capacity and opportunity to discover the alleged fraud and they failed to exercise due diligence as a matter of law; (3) the trial court's ruling that plaintiffs' breach of contract action was barred by the statute of limitations is the law of the case since plaintiffs abandoned this assignment of error on appeal; and (4) plaintiffs' claim for negligent misrepresentation must fail because the relationship between plaintiffs and defendant trustee was adversarial, defendant trustee owed no duty of care to plaintiffs, and plaintiffs could not have justifiably relied on defendant trustee for accurate information. Furthermore, plaintiffs' appeal is moot because plaintiffs abandoned their assignment of error relating to the trial court's decision to dismiss the breach of contract claim as barred by the statute of limitations, and the remaining claims are contingent on the viability of plaintiffs' underlying claim for breach of contract.

## 2. Damages and Remedies— loss of funding—damages not reasonably ascertainable—settlement agreement—failure to allege tort damages

The trial court properly entered summary judgment for defendant bank and defendant law firm in an action by plaintiff nonprofit pain clinic and its doctors to recover loss of funding damages allegedly caused by defendant's acts of negligence and fraud in causing the clinic to lose twenty years of annual funding by a charitable foundation because: (1) the clinic's damages were not ascertainable to a reasonable degree of certainty because they were contingent upon the clinic remaining tax exempt, the clinic's submission of annual grant requests, and the foundation having the funds available; (2) the clinic was completely compensated for such loss in a settlement agreement with the foundation and may not obtain recovery for the same loss against the bank and the law firm; and (3) the doctors have failed to allege any individual pecuniary loss measured by the difference between the benefit promised and the benefit received.

Appeal by plaintiff from judgment entered 31 May 2001 by Judge Ben F. Tennille in Superior Court, Forsyth County. Heard in the Court of Appeals 15 April 2003.

*Elliot Pishko Morgan, P.A., by Robert M. Elliot for plaintiffs-appellants the PIPM Parties.*

*Adams Kleemeier Hagan Hannah & Fouts, by Daniel W. Fouts for defendant-appellee Centura Bank.*

*Smith Helms Mulliss & Moore L.L.P., by Larry B. Sitton, Manning A. Connors, and Jonathan P. Heyl, for defendants-appellee Poyner & Spruill, L.L.P.*

*Bell, Davis & Pitt, P.A., by William K. Davis, James R. Fox, and Kevin G. Williams, for defendants-appellees Phillip A. R. Staton and the Staton Foundation.*

WYNN, Judge.

This appeal arises from a determination: (1) that a settlement agreement ("Settlement") between the Piedmont Institute of Pain Management ("the Piedmont Clinic"), the doctors employed by the Piedmont Clinic ("Doctors") (collectively "The Piedmont Parties"), Phillip Staton, and the Staton Foundation ("Foundation") was binding

and enforceable, and (2) that the Settlement released the law firm of Poyner & Spruill and Centura Bank "to the extent that [the Piedmont Parties'] damages . . . [did] not exceed $365,000."

On appeal, the Piedmont Parties argue that the negligent, fraudulent, and deceptive actions of Phillip Staton, and his agents, proximately resulted in the Piedmont Parties' decision to execute that Settlement. Accordingly, the Piedmont Parties seek to set aside the Settlement in order to pursue damages against Phillip Staton and the Foundation arising under the original breach of contract. Furthermore, the Piedmont Parties concede that their damages, excluding those arising from the Settlement's termination of the Foundation's contractual obligations to fund Piedmont ("loss of funding damages"), do not exceed $365,000. However, the Piedmont Parties argue that the trial court erred by not permitting the Piedmont Parties to pursue loss of funding damages against Centura Bank and Poyner & Spruill under causes of action sounding in tort. After carefully reviewing the record and relevant case law, we affirm the trial courts' summary judgment order.

## I. Facts

The summary judgment order of Judge Tennille sets out the complex factual background culminating in the five consolidated cases presently before this Court and decided herein. We summarize the facts relevant to this case as follows.

Albert Staton founded the Pan American Beverage Company ("Panamco"). In the late 1980s, upon Albert Staton's passing, his son, Phillip Staton, his daughter, Ingeborg Staton, and his wife, Mercedes Staton ("the Statons"), inherited Albert Staton's interest in Panamco. On 8 June 1993, the Statons entered into a Purchase Agreement to sell their stock in Panamco for approximately $119,000,000.00. On that date, Mercedes and Ingeborg Staton appointed Phillip Staton as the sellers' agent. On 25 June 1993, Phillip Staton executed a power of attorney naming Tom and Jerri Brame as his agents to act in his place and stead "with particular regard to the receipt and disbursement of [the Panamco] funds to be wired to Centura Bank on [his] behalf."[1] Pursuant to this authority, the Brames opened an account for Phillip,

---

1. The trial court noted the existence of substantial evidence that in the "Brames' management of these various accounts, tens of millions of dollars were lost, and substantial sums were transferred by the Brames for their own benefit." As a result, Tom Brame asserted his Fifth Amendment privilege and refused to testify in the civil proceedings below.

Ingeborg, and Mercedes Staton, for the receipt of the Panamco funds at Centura Bank in Winston-Salem, North Carolina. On 16 July 1993, the proceeds of the Panamco stock sale were wired to Centura Bank.

In August 1993, Tom Brame discussed with Dr. Stuart Meloy the possibility of financing a pain clinic in order to create a tax shelter for the proceeds of the Panamco sale. In September 1993, Dr. Meloy sent Tom Brame a proposal for the establishment of the Piedmont Clinic. On 1 November 1993, Tom Brame met with three Centura Bank trust officers to discuss the creation of a charitable trust and foundation to fund the Piedmont Clinic. The parties selected the law firm of Poyner & Spruill to prepare the necessary documents. After reviewing documentary material, Poyner & Spruill questioned whether the existing power of attorney authorized Tom Brame to make charitable gifts. To resolve this problem, Poyner & Spruill drafted a new durable power of attorney specifically authorizing charitable gifts. Despite the specific request by Poyner & Spruill that the Statons personally sign their respective durable power of attorney, Phillip Staton signed for Ingeborg and Mercedes Staton as their attorney-in-fact.

On 1 February 1995, the Piedmont Clinic opened and began accepting patients. Shortly thereafter, on 29 March 1996, the Statons informed the Piedmont Parties, Centura Bank, and Poyner & Spruill, that they did not authorize the funding framework for the Piedmont Clinic, wanted to terminate the Foundation, and wanted to retrieve their monies from the charitable trusts funding the Foundation and the Piedmont Clinic. For Poyner & Spruill this revelation created a potential conflict between their legal representation of Centura Bank and the Piedmont Parties. Consequently, immediately after the meeting, Mary Beth Johnston, an attorney for Poyner & Spruill, informed the Doctors that Poyner & Spruill would not be able to represent the Piedmont Parties without a conflict waiver from Centura Bank. On 30 March 1996, William West, then representing the legal interest of Ingeborg and Mercedes Staton, contacted Drs. Meloy and Martin and recommended that the Piedmont Parties hire his former law partner, Edward Powell. On that same date, the Piedmont Parties consulted with and hired Powell.

On 16 April 1996, a settlement agreement was completed. The Piedmont Parties, represented by Powell, agreed to "release, acquit and forever discharge the Foundation, Phillip [Staton], individually and as Trustee of the Foundation, [and] Ingeborg [Staton]" in exchange for the Foundation's payment of $365,000 to the Pied-

mont Parties. The Settlement expressly provided that the $365,000 "shall be in full, complete, and final satisfaction of any and all claims . . . actions, causes of actions, and rights arising under or in connection with the [contract and] . . . the Foundation's funding of [the Piedmont Clinic]."

## II. The Settlement Agreement (00 CVS 2178)

On 25 February 2000, the Piedmont Parties filed a complaint contending that the Settlement should be set aside because the Piedmont Parties executed the agreement "under duress as a direct result of the fraud, threats, undue influence, mutual mistakes of fact and law, and other improper actions of the Statons' agents." The Piedmont Parties alleged:

(a) Centura Bank and Poyner & Spruill now represent, contrary to indications conveyed to plaintiffs at the meeting at Centura Bank in March, 1996, that the creation and funding of the [charitable trusts] were properly authorized by the Statons, and that therefore, the grants to plaintiffs were valid.

(b) Phillip Staton has testified under oath in a deposition that he was aware of the creation of his trusts at the time it was created in 1993, as well as the amount of his funds committed thereto; that he executed durable powers of attorney in favor of Tom and Jerri Brame on behalf of himself and Ingeborg Staton. . . .

(c) Ingeborg Staton had given to Phillip Staton a general power of attorney in 1992 to act as her attorney-in-fact, and Phillip Staton had given a copy of this 1992 power of attorney to [his attorney] immediately prior to the negotiations which led to the purported settlement agreement. . . . .

(d) Ingeborg Staton has testified in depositions to actions which she took ratifying or acquiescing in numerous transactions handled by Tom or Jerri Brame.

Based on these allegations, the Piedmont Parties alleged that the Statons "conspired to misrepresent the facts concerning the validity of the trusts to induce [the Piedmont Parties] to release their interests in continued funding as promised in the grants." Accordingly, the Piedmont Parties asked the trial court to rescind the Settlement.

On 5 February 2001, the Statons and the Foundation filed a motion for summary judgment on all claims asserted by the Piedmont

Parties. In his 31 May 2001 summary judgment order, Judge Tennille succinctly framed the issue in noting that "the heart of each cause of action is the premise that [the Piedmont Parties] did not know that Phillip Staton had signed the 1993 Durable Power in his own name and the knowledge of that fact might have kept [the Piedmont Parties] from signing the Settlement, thereby releasing their contract claims against the Foundation." After reviewing the evidence, and detailing the undisputed facts, Judge Tennille granted the Foundation's summary judgment motion and concluded that the Settlement was binding and enforceable. From this determination, the Piedmont Parties appeal and assign error.

### A. Standard of Review

Under Rule 56 of the North Carolina Rules of Civil Procedure, summary judgment is properly granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2002). "An issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action." *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518, 186 S.E.2d 897, 901 (1972). "The moving party bears the burden of establishing the lack of a triable issue of fact." *Sykes v. Keiltex Industries, Inc.*, 123 N.C. App. 482, 484-85, 473 S.E.2d 341, 343 (1996) (citation omitted). Furthermore, "the evidence presented by the parties must be viewed in the light most favorable to the non-movant." *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998) (citation omitted).

### B. Breach of Fiduciary Duty

[1] In ruling that the Settlement was binding and enforceable, Judge Tennille addressed each of the Piedmont Parties' allegations challenging the validity of the Settlement's execution. First, Judge Tennille concluded that, even if a fiduciary duty did exist between Phillip Staton and the Piedmont Parties, this fiduciary duty was repudiated before the settlement negotiations.

{85} [The Piedmont Parties] claim[] that Phillip as trustee to the Foundation owed a fiduciary duty to [the Piedmont Parties] to affirmatively disclose the existence of the powers of

attorney signed by Phillip that were used to establish the Foundation and the [charitable trusts]. . . .

{86} Even if Phillip did owe a fiduciary duty to [the Piedmont Parties], this duty ended when Phillip, through his lawyer, told the parties that he would no longer fund the Foundation or [the Piedmont Clinic]. (citation omitted). Hence, Phillip repudiated the fiduciary relationship, and his duty to disclose the existence of any powers of attorney ended at that time. . . .

On appeal, the Piedmont Parties challenge this conclusion by arguing that "the Statons were only adversarial in the sense that they had stated that they would no longer permit funding of [the Piedmont Clinic]." Based on this limited repudiation, the Piedmont Parties argue that they "had no evidence to indicate that Phillip, in particular, was misrepresenting the facts . . . that his [power of attorney] to Tom [Brame] was not valid." Accordingly, the Piedmont Parties contend it was error for the trial court to conclude that a fiduciary duty did not compel Phillip Staton to disclose the existence of any documentation supporting the Piedmont Clinic's claims to funding.

After reviewing the record and relevant case law, we disagree. In *Lancaster v. Lancaster*, 138 N.C. App. 459, 530 S.E.2d 82 (2000), for instance, this Court held that "while a husband and wife generally share a confidential relationship . . . It is well established that when one party to a marriage hires an attorney to begin divorce proceedings, the confidential relationship is usually over." *Id.* at 463, 530 S.E.2d at 85; *see also Small v. Dorset*, 223 N.C. 754, 761, 28 S.E.2d 514, 518 (1944) (noting that a trust relationship continues until repudiated). In the case *sub judice*, the Piedmont Parties concede that at the time of the settlement negotiations both parties were represented by counsel, both parties were negotiating for the termination of legal rights, and that, as of March 1996, Phillip Staton had repudiated his fiduciary duties.[2] The Piedmont Parties have not presented any evi-

---

2. These sentiments are echoed in the trial court's unchallenged ruling that the Settlement was not the product of undue influence.

{92} [The Piedmont Parties'] claim of undue influence in connection with the Settlement also fails for lack of any evidence supporting such claim. . . . [The Piedmont Parties] retained its own experienced counsel. . . . [The Piedmont Parties] were [not] in any immediate physical or financial danger . . . .

{93} Phillip's counsel clearly put [the Piedmont Parties] on notice that Phillip was contesting the creation of the [charitable trusts] and the Foundation. That fact was true. Legal grounds for Phillip's challenge existed. Whether or not

dence creating a genuine issue of material fact with respect to the absence of the adversarial nature of their relationship with Phillip Staton during the relevant time. As case law indicates, in such an adversarial setting, Phillip Staton did not have an affirmative duty to disclose unfavorable facts. *See e.g., supra,* Lancaster, 138 N.C. App. at 463, 530 S.E.2d at 85; *Small,* 223 N.C. at 761, 28 S.E.2d at 518. Absent a fiduciary duty, the Piedmont Parties' claim for breach of fiduciary duty is untenable. Accordingly, we affirm the trial court's decision to grant summary judgment on the Piedmont Parties' claim for breach of fiduciary duty.

## C. Fraud

After disposing of the Piedmont Parties' breach of fiduciary duty claim, Judge Tennille addressed the Piedmont Parties' claim for fraud.

{90} The statute of limitations for fraud [is] three years after the fraud is discovered or should have been discovered. . . . [The Piedmont Parties] admit[] in [their] brief that Phillip, "in March 1996 . . . refused to pay the grant monies due and repudiated his fiduciary duties." . . . . In light of this repudiation, [the Piedmont Parties were] put on notice in March 1996 to use due diligence to investigate and discover whether fraud existed before signing the settlement agreement; the statute limitation began to accrue in March 1996 and ran out in March 1999. If [the Piedmont Parties] had requested at that time a copy of the very documents at issue, it could have discovered any alleged fraudulent behavior by defendant. [The Piedmont Parties] did not ask for any documents as it entered into settlement negotiations. . . . This action was not filed until February 2000. Although the parties signed a tolling agreement it too was signed outside the statute of limitations period on April 14, 1999. The statute of limitations bars [the Piedmont Parties'] fraud claims against Phillip.

Accordingly, Judge Tennille dismissed the Piedmont Parties' fraud claim as barred by the statute of limitations.

On appeal, the Piedmont Parties' contend that they "did not obtain information establishing Phillip Staton's fraud until his deposi-

---

he would have prevailed on his claims at trial was the risk he and [the Piedmont Parties] faced in April 1996 and on which they negotiated and compromised. . . . There was no misrepresentation.

PIEDMONT INST. OF PAIN MGMT. v. STATON FOUND.

[157 N.C. App. 577 (2003)]

tion in January, 1997." Relying on our decision in *Spears v. Moore*, 145 N.C. App. 706, 55 S.E.2d 483 (2001), the Piedmont Parties argue that "when there is a dispute as to a material fact regarding when the plaintiff should have discovered the fraud, summary judgment is inappropriate, and it is for the jury to decide if the plaintiff should have discovered the fraud." *Id.* at 708, 55 S.E.2d at 485. The *Spears* Court, however, also held that: "Failure to exercise due diligence may be determined as a matter of law . . . where it is 'clear that there was both capacity and opportunity to discover the mistake.' " *Id.* at 708-09, 55 S.E.2d at 485.

In the case *sub judice*, Judge Tennille ruled, and we affirm his ruling, that the Piedmont Parties failed to exercise due diligence in uncovering the alleged fraud as a matter of law. The trial court's order noted that on 4 April 1996 Poyner & Spruill "sent a fax memo to Edward Powell[,counsel for the Piedmont Parties,] . . . offering to provide copies of documents from [the] file." This file contained Phillip Staton's 1993 durable power of attorney, and other documents relied upon by the Piedmont Parties in their fraud claim. Although given the opportunity, neither counsel nor the Piedmont Parties requested access to this file before entering into the Settlement. Under our decision in *Spears*, as relied upon by the Piedmont Parties, "it is clear that [the Piedmont Parties had] both capacity and opportunity to discover" Phillip Staton's alleged fraud in March 1996. Accordingly, the Piedmont Parties' fraud claim began to accrue in March 1996 and expired in March 1999. The Piedmont Parties did not file their action alleging fraud until February 2000. Therefore, the Piedmont Parties' action is barred by the statute of limitations; accordingly, we affirm the decision of the trial court.[3]

### D. Breach of Contract

Next, Judge Tennille ruled that the Piedmont Parties' breach of contract claim against Phillip Staton was also barred by the statute of limitations. Judge Tennille reasoned that:

{95} The statute of limitations on [the Piedmont Parties'] breach of contract claim filed in 00-CVS-2178 has also run. As indi-

---

3. During oral argument, the Piedmont Parties argued that access to the documents was contingent on the consent of all parties and, therefore, they did not, in a literal sense, have the opportunity and capacity to obtain the 1993 durable power of attorney. Despite this argument, one critical fact remains: Poyner & Spruill offered the Piedmont Parties an opportunity to view the materials which are the basis for this fraud claim, and the Piedmont Parties did not diligently pursue this opportunity.

cated above, Phillip had both breached his contract with [the Piedmont Parties] in 1995 and repudiated any continuing obligations in March 1996. The statute of limitations for breach of contract is three years. . . . This action was not filed until February 2000 . . . . Thus, the claim for breach was filed outside the limitations period.

Although the Piedmont Parties assigned error to this conclusion, the Piedmont Parties have abandoned this assignment of error on appeal. Under well settled principles, the Piedmont Parties' decision to abandon this assignment of error renders the trial court's decision to dismiss the breach of contract claim, as barred by the statute of limitations, "the law of the case on that issue, and it is *res judicata* and binding upon the court in the second trial." *Duffer v. Royal Dodge, Inc.*, 51 N.C. App. 129, 130, 275 S.E.2d 206, 207 (1981).

### E.  Negligent Misrepresentation

On appeal, the Piedmont Parties also assign error to the trial court's decision to grant summary judgment on the pleadings with respect to the Piedmont Parties' claim for negligent misrepresentation against the Foundation and the Statons.[4] As essential elements of negligent misrepresentation, the Piedmont Parties must prove that (1) Phillip Staton owed a duty of care to the Piedmont Parties, and (2) that the Piedmont Parties justifiably relied on Phillip Staton for accurate information. *Jordan v. Earthgrains Cos.*, 155 N.C. App. 762, 766, 576 S.E.2d 336 (2003). However, as noted in our discussion of the Piedmont Parties' breach of fiduciary duty claim, during the settlement negotiations Phillip Staton and the Piedmont Parties were adverse. Accordingly, Phillip Staton neither owed a duty to the Piedmont Parties nor could the Piedmont Parties have justifiably relied upon him. Consequently, we affirm the trial court's judgment and overrule this assignment of error.

We have reviewed the Piedmont Parties remaining assignments of error relating to Phillip Staton, Ingeborg Staton, and the Foundation,

---

4. On 1 August 2000, the Piedmont Parties' claims against the Foundation and Phillip Staton for interference with contract, breach of duty of good faith, mutual mistake of fact, duress, and negligent misrepresentation were disposed of by the Honorable L. Todd Burke on a 12(c) Motion for Judgment on the Pleadings. We note, that "[t]he standard of review for a Rule 12(c) motion is whether the moving party has shown that no material issue of fact exists upon the pleadings and that he is clearly entitled to judgment." *Affordable Care v. N.C. State Bd. of Dental Examiners*, 153 N.C. App. 527, 532, 571 S.E.2d 52, 57 (2002).

and find them to be without merit. Therefore, we affirm the trial court's summary judgment order.[5]

### F. Mootness

Furthermore, as an alternative ground for affirming the trial court's summary judgment order, we hold that the Piedmont Parties' appeal is fatally defective with respect to the Foundation and the Statons. Although the Piedmont Parties initially assigned error to the trial court's decision to grant summary judgment on the underlying breach of contract claim, they abandoned this assignment of error by failing to brief it on appeal. *See* N.C. R. App. Proc. 28(a); *State v. Prevatte*, 356 N.C. 178, 214, 570 S.E.2d 440, 460 (2002). As noted, under well settled principles, the Piedmont Parties' decision to abandon this assignment of error renders the trial court's decision to dismiss the breach of contract claim, as barred by the statute of limitations, "the law of the case on that issue, and it is *res judicata* and binding upon the court in the second trial." *Duffer*, 51 N.C. App. at 130, 275 S.E.2d at 207.

The Piedmont Parties assignments of error relating to breach of fiduciary duty, negligent misrepresentation, and fraud, are contingent on the viability of the Piedmont Parties' claims arising from an alleged breach of contract.[6] Consequently, even if this Court were to

---

5. As noted, the present action before this Court is actually five consolidated cases for the purposes of appeal. In three of these cases, 96 CVS 1409, 96 CVS 7224, and 99 CVS 5156, the Piedmont Parties assign error to the trial court's approval of a confidential settlement ("Settlement II") in which Centura Bank, Phillip Staton, individually and as trustee of the Foundation, Ingeborg Staton, and Poyner & Spruill, agreed to terminate the charitable trusts and dissolve the Foundation. In addition to assigning error, the Piedmont Parties have filed a petition for a writ of certiorari—anticipating that this Court would likely conclude that they lacked standing to challenge Settlement II to which they were not a party. Herein, we decline to address the Piedmont Parties' assignments of error, and deny their petition for a writ of certiorari, because by the express terms of the first Settlement:

    8. It [was] agree[d] that [the Piedmont Parties] . . . [would not] oppose any effort by Phillip to dissolve the Foundation or his alleged charitable trusts that have funded the Foundation.

By affirming the trial court's decision that the Settlement is binding and enforceable, the Piedmont Parties released any right, if any, to oppose Settlement II which dissolved the trusts and the Foundation.

6. For instance, in its claim to set aside the Settlement on the basis of fraud, the Piedmont Parties allege that "statements made by [the Foundation, the Statons, and the Statons' agents] . . . were made with the intent to induce, coerce, and mislead [the Piedmont Parties] into releasing valuable contractual rights." In the Piedmont Parties' claim to set aside the Settlement on the basis of negligent misrepresentation, the

set aside the Settlement on the basis of fraud, negligent misrepresentation, or breach of fiduciary duty, the statute of limitations forever bars the Piedmont Parties' claims arising from the Foundation's and the Statons' alleged breach of contract. "Whenever, during the course of litigation it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should be dismissed, for courts will not entertain or proceed with a cause merely to determine abstract propositions of law." *In re Peoples*, 296 N.C. 109, 147, 250 S.E.2d 890, 912 (1978). In the case *sub judice*, the questions originally in controversy between the Piedmont Parties, the Foundation, and the Statons—namely, damages arising from the alleged breach of contract—are no longer at issue. Accordingly, as an alternative ground for affirming the trial court's summary judgment order, we find that the Piedmont Parties' collateral attack of the Settlement is moot by virtue of the trial court's unchallenged ruling that the underlying breach of contract claim is barred by the statute of limitations.

### III. Poyner & Spruill and Centura Bank (96 CVS 7140)

[2] On 14 May 1996, the Piedmont Parties filed an amended complaint alleging numerous claims against Centura Bank and Poyner & Spruill including breach of fiduciary duty, fraud, constructive fraud, negligent misrepresentation, professional negligence, breach of rules of professional conduct, and unfair and deceptive trade practices. In these claims, the Piedmont Clinic and the Doctors, in their individual capacities, sought to recover loss of funding damages proximately caused by the alleged negligence of defendants. On 5 February 2001, Centura Bank and Poyner & Spruill filed motions for summary judgment on all claims asserted by the Piedmont Parties. On 31 May 2001, the trial court granted summary judgment with respect to all claims, except for professional negligence and negligent misrepresentation. On appeal, the Piedmont Parties contend the trial court erred in granting summary judgment on their claims against Poyner & Spruill and Centura Bank. After carefully reviewing the record, we disagree.

---

Piedmont Parties allege that "[the Statons' agents] negligently or recklessly misrepresented facts concerning the Statons' authorization of the funding of [the Piedmont Clinic] and other facts concerning the validity of the [contract]." In the Piedmont Parties' claim to set aside the Settlement on the basis of breach of fiduciary duty, the Piedmont Parties allege that the Foundation and the Statons "obtained potential benefits from their wrongful acts in the purported release of them from their ongoing contractual obligations."

The trial court dismissed the Piedmont Parties' claims on numerous grounds. Judge Tennille addressed "the damages issues first because the measure of damages permeates the liability issues." Judge Tennille realized that "the heart of the dispute between [the Piedmont Parties, Poyner & Spruill] and Centura Bank is the measure of damages under any cause of action" asserted by the Piedmont Parties. We agree.

In his summary judgment order, Judge Tennille framed the damages issue by concluding that "the damages recoverable by [the Piedmont Parties] . . . [are] limited to damages in excess of [those] recovered by [the Piedmont Parties] in the Settlement agreement." Furthermore, the trial court provided that "if [the Piedmont Parties'] claims for damages other than loss of funding do not exceed $365,000, [Poyner & Spruill] and Centura Bank are entitled to summary judgment, and this order would constitute a final order on all claims." In order to certify that the trial court's summary judgment was a final order, and immediately appealable, the Piedmont Parties "stipulated . . . that [their] damages, other than those relating to the loss of funding, [did] not exceed the amount of $365,000." On appeal, the Piedmont Parties argue the trial court erred because "under standard tort damage principles [they are] entitled to recover . . . the loss of [] funding" proximately caused by the negligent and fraudulent acts of Centura Bank and Poyner & Spruill.

## A. Standard of Review

As noted, under Rule 56 of the North Carolina Rules of Civil Procedure, summary judgment is properly granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c). Furthermore, "the evidence presented by the parties must be viewed in the light most favorable to the non-movant." *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. at 733, 504 S.E.2d at 577 (citation omitted).

A party is entitled to judgment as a matter of law if the non-movant fails to forecast evidence with respect to an essential element of a claim. *Murray v. Justice*, 96 N.C. App. 169, 174, 385 S.E.2d 195, 199 (1989). "Certain torts require as an essential element . . . that plaintiff incur actual damage." *Hawkins v. Hawkins*, 101 N.C. App. 529, 532, 400 S.E.2d 472, 474 (1991). Relevant to the present case, these torts include: (1) negligent misrepresentation, *Simms v.*

*Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 532, 537 S.E.2d 237, 240 (2000); (2) breach of fiduciary duty, *Pitts v. Am. Sec. Ins. Co.*, 144 N.C. App. 1, 8, 550 S.E.2d 179, 186 (2001); (3) fraud, *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988); (4) constructive fraud, *Jay Group, Ltd. v. Glasgow*, 139 N.C. App. 595, 600, 534 S.E.2d 233, 236 (2000); and (5) unfair and deceptive trade practices, N.C. Gen. Stat. § 75-1.1 (2002).

Accordingly, the trial court properly granted summary judgment with respect to all claims if (1) the non-profit Piedmont Clinic failed to forecast evidence of actual damage proximately caused by the negligent, fraudulent, and deceptive practices of Centura Bank or Poyner & Spruill, and (2) the Doctors, in their individual capacities, failed to forecast evidence of actual damage.

## B. The Piedmont Clinic's Loss of Funding Damages

The Piedmont Clinic and the Doctors concede that they "received an amount in excess of [their] non-funding losses" in the Settlement. However, the Piedmont Clinic argues that the trial court erred by denying it the opportunity to seek loss of funding damages against Centura Bank and Poyner & Spruill which exceeded $365,000. After carefully reviewing the record and relevant case law, we hold that the Piedmont Clinic may not seek loss of funding damages against Poyner & Spruill or Centura Bank because the Piedmont Clinic was completely compensated for these losses in the Settlement.

We note, at the onset of our analysis, that a search of legal databases for the term "loss of funding damages" does not return one case in the annals of the state or federal judiciary in the past two hundred years. Furthermore, during oral argument the Piedmont Clinic conceded that it was not aware of one case where a non-profit organization was awarded damages, or even alleged damages, on the basis of lost funding. Nevertheless, the Piedmont Clinic argues that they should be able to recover damages, measured by their lost funding attendant to the grant letter with the Foundation, through tort actions against Poyner & Spruill and Centura Bank. Although, for the reasons stated herein, it is unnecessary for this Court to decide whether or not loss of funding damages are available in North Carolina, we note that a claim to such damages is tenuous, at best.

The Piedmont Clinic relies on our decision in *Leftwich v. Gaines*, 134 N.C. App. 502, 521 S.E.2d 717 (1999), for the proposition that loss of funding damages are available in North Carolina tort actions. In

*Leftwich,* we held that "a plaintiff may recover loss of bargain dam-ages in a tort action if she establishes (1) that the damages are the natural and probable result of the tortfeasor's misconduct and (2) that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." The Piedmont Clinic's reliance on *Leftwich* is misplaced. Despite its broad language, *Leftwich* does not stand for the proposi-tion that loss of bargain damages, let alone loss of funding damages, are available in all tort actions in North Carolina. *See e.g., Middleton v. Russell Group,* 126 N.C. App. 1, 483 S.E.2d 727 (1997).

Moreover, even assuming that *Leftwich* controls, the Piedmont Clinic has failed to present any evidence to satisfy the requirement in *Leftwich* "that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." The Piedmont Clinic's loss of funding claims arise from a 21 October 1994 grant letter which provided:

> [T]he Foundation agrees that it will provide additional funding to [the Piedmont Clinic] in an amount of approximately $900,000 per year for a period of twenty years . . . . [H]owever, this agreement for long-term funding is expressly conditional upon the Foundation itself having such funds available . . . . [Additionally the Piedmont Clinic] must renew its grant request annually in writing. . . . [Moreover,] in the event that [the Piedmont Clinic's] tax-exempt status is revoked, [the Piedmont Clinic] shall return to the Foundation any funds not expended or committed at such time, and the Foundation will suspend its financial support of [the Piedmont Clinic].

Consequently, the Piedmont Clinic's theory of damages requires the finder of fact to speculate, in contravention of *Leftwich,* as to whether (1) the Piedmont Clinic would have remained tax-exempt for twenty years, (2) the Piedmont Clinic would have continued to sub-mit annual grant requests for twenty years, and (3) the Foundation would have had funds available for twenty years. Given these contin-gencies, it can not be said that the Piedmont Clinic's alleged damages could have been ascertained to a "reasonable certainty." Accordingly, the Piedmont Clinic can not rely on *Leftwich* for the proposition that they are entitled to loss of funding damages.

Notwithstanding the Piedmont Clinic's misplaced reliance on *Leftwich,* we need not fully address the issue of whether loss of fund-ing damages are available in North Carolina, as this issue is resolved

on more narrow grounds. In the Settlement, the Piedmont Clinic agreed to "release, acquit and forever discharge the Foundation" in exchange for $365,000 which was to be considered a "full, complete, and final satisfaction of any and all claims [the Piedmont Clinic had] with respect to . . . any claims, actions, causes of actions, and rights arising under" the contract including "the Foundation's funding" of the Piedmont Clinic. By settling its alleged "loss of funding damages" with the Foundation and the Statons, the Piedmont Clinic is barred, as a matter of law, from obtaining "double recovery" for the same loss or injury from Centura Bank and Poyner & Spruill. This result is required by this Court's decision in *Chemimetals Processing, Inc. v. Schrimsher*, 140 N.C. App. 135, 535 S.E.2d 594 (2000), where we held that a plaintiff, who had previously entered into a settlement fully compensating plaintiff, could not recover against its board of directors, or its Certified Public Accountants ("CPAs"), for the same injury. *See also Kogut v. Rosenfield*, 157 N.C. App. ——, ——, —— S.E.2d ——, —— (2003).

"In *Chemimetals*, the plaintiff sued its corporate president for breach of contract, breach of fiduciary duty, and unfair and deceptive trade practices arising from the president's scheme to divert money to himself. Before the case proceeded to trial, the parties entered into a 'Settlement Agreement and Mutual Release.' In consideration for the settlement, plaintiff dismissed the complaint. Plaintiff then initiated a second lawsuit against the board of directors and accountants alleging that they conspired to present financial statements which overstated the assets for three fiscal years. The trial court entered summary judgment for the board of directors and accountants." *Kogut*, 157 N.C. App. at ——, —— S.E.2d at —— (citations omitted).

"The plaintiff in *Chemimetals* appealed the order of summary judgment arguing that the release entered in the first action did not preclude the claims brought in the second action against the board of directors and accountants. This Court acknowledged that although the plain terms of the release did not bar the second action, the plaintiff could not assert a second action against the board of directors and accountants to collect for the same losses recovered in the first action against its president. Our Court asserted that:"

[The plaintiff] has suffered but one injury in this case—monetary loss due to the purported diversion of profits and labor from [the plaintiff] by [the plaintiff's president]. Under the facts as alleged by [the plaintiff], all actions in the course of events leading to

financial demise of [the company] were concurrent. [The plaintiff's] monetary loss, which was the injury created by [the president's] scheme, is the same injury caused by the alleged failure of the board of directors and CPAs to notice [the president's] unlawful acts. That only one injury occurred is in no way altered by the fact that the board of directors and CPAs may have been guilty of separate wrongdoing. . . . [Plaintiff] may not assert a second action seeking to collect for those losses against the board of directors and CPAs.

"The *Chemimetals* court held that by entering into the settlement agreement in the first action, plaintiff had been compensated for the company's decline in income and could not seek to recover for those same losses from the board of directors and CPAs." *Kogut,* 157 N.C. App. at ——, —— S.E.2d at —— (citations omitted).

In concluding that our decision in *Chemimetals* was a bar to the Piedmont Parties' claims against Poyner & Spruill and Centura Bank, Judge Tennille noted:

The facts in *Chemimetals* are strikingly similar to those in the case at bar. Like *Chemimetals*, the losses [the Piedmont Parties] seek[] to recover for damages resulting from the creation and termination of the [charitable trusts] and Foundation are the same losses that were compensated by the Settlement with Phillip and the Foundation. Thus, from this event, [the Piedmont Parties] may only recover once for its damages.[7]

On appeal, the Piedmont Clinic argues that the Settlement did not fully compensate them for their non-funding losses. However, the clear terms of the Settlement provide that the $365,000 payment "shall be in full, complete, and final satisfaction of any and all claims [the Piedmont Parties have] with respect to the [contract] . . . .

---

7. As an alternative ground for denying the Piedmont Parties loss of funding damages, Judge Tennille also noted that the settlement "further deprive[d] [the Piedmont Parties] of any claim for damages they would have recovered from any party under its contract, including Centura Bank and [Poyner & Spruill], because [the Piedmont Parties] released their contractual rights in return for a cash payment." Accordingly, Judge Tennille reasoned:

{114} The Settlement itself acts as a bar to any claim for loss of funding. [The Piedmont Parties] had a contract with the Foundation. The Settlement released the Foundation from that contract, thus terminating it in exchange for cash. Having terminated the contract, [the Piedmont] Parties may not now sue [Poyner & Spruill] and Centura Bank for the loss of funding the contract provided.

[including] the Foundation's funding of [the Piedmont Clinic]."[8] The Piedmont Clinic did not present any evidence which, when viewed in the light most favorable to the Piedmont Clinic, created a genuine issue of material fact concerning the measure of damages.

In sum, we affirm the trial court's summary judgment order dismissing the Piedmont Clinic's remaining claims against Centura Bank and Poyner & Spruill because (1) the Piedmont Clinic concedes that its non-funding damages do not exceed $365,000, (2) the Piedmont Clinic was fully compensated for its loss of funding damages, if any, in the Settlement, and (3) the Piedmont Clinic has not alleged any other damages.

## C. Doctor's Loss of Funding Damages

The Doctors, in their individual capacities as employees of the Piedmont Clinic, have asserted claims identical to those asserted by the Piedmont Clinic against Centura Bank and Poyner & Spruill. Although certainly not clear in their complaint, seemingly, the Doctors seek an amount equal to their contemplated annual salaries at the Piedmont Clinic multiplied by twenty years. The trial court limited the Doctors' recovery to damages based upon reliance and change of circumstance in procuring alternative employment. On appeal, the Doctors claim entitlement to twenty years of anticipated damage flowing from the negligent acts and omissions of Poyner & Spruill and Centura Bank which resulted in the Doctors' decision to forego their rights to an annual salary paid by the Piedmont Clinic's lost funding. Therefore, the Doctors assign error to this ruling.

After carefully reviewing the record, we hold that the related assignments of error and arguments are fatally undermined by the Doctors' multiple stipulations in the trial court and on appeal. On 25 October 2000, the Doctors made the following pertinent stipulations:

2. . . . Any fluctuation (increases or decreases between the years) in the doctors' annual compensation from [Piedmont

---

8 Although the Settlement expressly provided that it "in no way shall . . . operate as a release of any claims . . . against Centura Bank [or] Poyner & Spruill," this language does not provide the Piedmont Parties with a right, or a forum in which, to seek double recovery. Furthermore, the settlement agreement construed by this Court in *Chemimetals* contained a similar provision. Notwithstanding this provision, we held "the plain language of the release . . . [did] not end our inquiry." Instead, we determined that "only one injury occurred" despite the existence of "separate wrongdoing." Because plaintiff had already obtained a "full recovery" for that injury, as in the case *sub judice*, we held that "Chemimetals may not assert a second action seeking to collect for those [same] losses. . . ." *Chemimetals*, 140 N.C. App. at 138, 535 S.E.2d at 597.

Anesthesia and Pain Consultants, P.A.] since 1997 is not caused by or attributable to [Poyner & Spruill].

3. Had Dr. Stuart Meloy remained with Winston-Salem Anesthesia Associates and not begun working for the Piedmont Clinic in 1995, he would have earned compensation from [the Winston-Salem Anesthesia Associates] ranging between $317,120.03 (his 1994 compensation from [the Winston-Salem Anesthesia Associates]) and $317,279.04 (his 1997 compensation from [Piedmont Anesthesia and Pain Consultants]).

4. Had Drs. William J. Martin and Nancy Faller remained with the Medical University of South Carolina and not moved to North Carolina in 1995 [to work at the Piedmont Clinic], they each would have earned less compensation since 1995 than they actually earned from [the Piedmont Clinic] and [the Piedmont Anesthesia and Pain Consultants].

Furthermore, on 7 June 2001, the Doctors, in their individual capacities, stipulated and agreed that their "damages, other than those relating to the loss of funding, [did] not exceed the amount of $365,000." As noted, the Piedmont Parties' settled their claims against the Foundation and the Statons for $365,000.

The damages that the Doctors now seek against Poyner & Spruill and Centura Bank, based upon various negligence, fraud, and breach of fiduciary duty claims are not properly termed "loss of funding damages" under North Carolina law. Instead, damages in such actions are measured by the difference between the benefit received—the Doctors' current and reasonably certain annual salaries over the next twenty years—and the benefit promised—the Doctors' reasonably certain annual salaries at the Piedmont Clinic over the next twenty years. *See e.g.*, *River Birch Assoc. v. Raleigh*, 326 N.C. 100, 130, 388 S.E.2d 538, 556 (1988) ("The measure of damages for fraud . . . is the difference between the value of what was received and the value of what was promised."); *Middleton v. Russell Group*, 126 N.C. App. 1, 29, 483 S.E.2d 727, 743 (1996) ("The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss . . . ."); *Bernard v. Central Carolina Truck Sales, Inc.*, 68 N.C. App. 228, 233, 314 S.E.2d 582, 585 (1984) (Prior to trebling damages in an unfair and deceptive trade practices case, "[t]he measure of damages . . . is [intended] 'to restore the victim to his original condition . . . .'").

SMITH v. STATE FARM MUT. AUTO. INS. CO.

[157 N.C. App. 596 (2003)]

Consequently, the Doctors' alleged damages are not based on or measured by the Piedmont Clinic's "loss of funding," rather the Doctors' damages, if any, are limited to individual pecuniary loss measured by the difference between the benefit promised and the benefit received. However, based upon the Doctor's own stipulations, they have not suffered any damages, other than "loss of funding" damages. Accordingly, the Doctors have failed to allege damages under any tort theory, and, therefore, their claims against Poyner & Spruill and Centura Bank were properly dismissed for failing to allege as damage an essential element of each cause of action.

Affirmed.

Judges TYSON and STEELMAN concur.