Maurer v. SlickEdit, Inc., 2006 NCBC 1

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| WAKE COUNTY | 04 CVS 10527 |

JILL L. MAURER,

       Plaintiff,

           ORDER AND OPINION

      v.

SLICKEDIT, INC., ANDRE BOISVERT,
ERICA H. BOISVERT, J. CLARK MAURER,
and HOWARD H. LEWIS,

       Defendants.

*O, what a tangled web we weave,*
*When first we practise to deceive!*
     – Sir Walter Scott, "Marmion" (1808)

{1}     This matter comes before the Court on Defendant Andre Boisvert's post-trial motions for judgment notwithstanding the verdict or in the alternative for a new trial and upon Plaintiff Jill Maurer's motion for liquidated damages under the North Carolina Wage and Hour Act, which was set aside for later determination prior to trial.

{2}     After considering the briefs and oral arguments of each party and for the reasons below, the Court GRANTS Defendant Boisvert's motion for judgment notwithstanding the verdict and Plaintiff's claim against SlickEdit, Inc. for liquidated damages under the North Carolina Wage and Hour Act. Defendant Andre Boisvert's motion, in the alternative, for a new trial is denied.

    *Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Mark A. Ash and J. Mitchell Armbruster for Plaintiff Jill L. Maurer.*

    *Womble Carlyle Sandridge & Rice, PLLC, by Pressly M. Millen and Melody C. Ray-Welborn for Defendants SlickEdit, Inc., Andre Boisvert, Erica H. Boisvert, J. Clark Maurer, and Howard H. Lewis.*

I.

{3}     Plaintiff filed her Amended Complaint in this action on July 30, 2004, asserting eight claims: (1) breach of fiduciary duty, (2) unfair and deceptive trade practices, (3) oppression, (4) constructive fraud, (5) fraud, (6) civil conspiracy, (7) unjust enrichment, and (8) rescission and reformation. Plaintiff filed an Amended Complaint on September 29, 2004, asserting the same claims and a ninth claim for slander.

{4}     This Court ruled on defendants' motion to dismiss on May 16, 2005. The Court dismissed six of plaintiff's claims and allowed the claims for fraud, slander, and rescission and reformation to continue.

After defendants filed their motion to dismiss but before this Court's ruling, plaintiff moved to amend her complaint. The Court granted the motion, and plaintiff filed her Second Amended Complaint on May 31, 2005, adding two new claims against Defendant SlickEdit, Inc.: (1) breach of employment contract and (2) recovery of unpaid wages under the North Carolina Wage and Hour Act. ("Wage & Hour Act").

{5}     Following cross-motions for summary judgment, this Court ruled in favor of plaintiff on the claim for breach of contract but dismissed plaintiff's slander claim against Clark Maurer and ruled that the rescission and reformation claim was moot. Plaintiff was awarded $240,212 in damages on her claim against the corporation for unpaid bonus payments. The Wage & Hour Act claim against the corporation was held open for later determination, and the fraud claims against Erica and Andre Boisvert proceeded to trial. No claims remained against Clark Maurer, and the claims against Howard Lewis had been dismissed by plaintiff.

{6}     A nine-day trial commenced on August 22, 2005. At the close of plaintiff's evidence, defendants moved for a directed verdict pursuant to Rule 50. The motion was denied. At the close of the defendants' case in chief, defendants again moved for a directed verdict, and that motion was denied. The case was submitted to the jury on the fraud claims against Erica Boisvert and Andre Boisvert. The jury returned a verdict in favor of Erica Boisvert and against Andre Boisvert, awarding plaintiff actual damages of $452,500 and an additional $1,130,000 in punitive damages.

{7}     Following the verdict, Defendant Andre Boisvert filed a Rule 50(b) motion for judgment notwithstanding the verdict and, in the alternative, a motion for new trial under Rule 59. The parties also filed briefs on the Wage & Hour Act issue that had been held open prior to trial.

{8}     The parties have been through two mediations and received repeated reminders from the Court that their inability to resolve their disputes in a businesslike manner threatened the long term viability of the company over which they were litigating.


II.

A.

{9}     This case is the quintessential corporate domestic drama fanned by the flames of a bitter divorce, unbounded egos among the actors, and an abundance of deceit. It is at once a morality play, a lesson in the benefit of written contracts, and a classic example of the dangers of executive hubris.

{10}    Plaintiff Jill L. Maurer is a resident of Wake County, North Carolina. Plaintiff is currently a 42.5% shareholder of SlickEdit, Inc. and served as its Chief Executive Officer until her termination in April 2004. She and Defendant Clark Maurer started and built the Company together. Mr. and Ms. Maurer legally divorced on February 14, 2003. Their divorce is inextricably intertwined with the corporate manipulations giving rise to the claims at issue.

{11}    Defendant SlickEdit, Inc. ("Slick Edit", "the Company") is a corporation organized under the laws of Virginia, with its principal place of business in Morrisville, Wake County, North Carolina.

{12}    Defendant J. Clark Maurer is a resident of Wake County, North Carolina. Mr. Maurer is a 42.5% shareholder of SlickEdit, the Chief Technology Officer of SlickEdit, and a member of the Company's Board of Directors. He designed the software that is the main product of the Company. Prior to trial, the claims against Clark Maurer were dismissed.

{13}    Defendant Andre Boisvert is a resident of Wake County, North Carolina. Mr. Boisvert is an 11% shareholder of SlickEdit and Chairman of the Company's Board of Directors. He is also a consultant or

officer in several other businesses driven by the creation, production, or marketing of computer software.

{14}    Defendant Erica H. Boisvert is a resident of Wake County, North Carolina. Ms. Boisvert serves as President and Chief Operating Officer of SlickEdit and is a member of the Company's Board of Directors. Ms. Boisvert is a 2.5% shareholder of SlickEdit. She is married to Andre Boisvert.

{15}    Howard H. Lewis is a resident of Wake County, North Carolina. Mr. Lewis is a 1% shareholder o f SlickEdit and a member of the Company's Board of Directors. He was formerly an officer at SlickEdit. The claims against Mr. Lewis were dismissed prior to trial.

B.

{16}    Jill and Clark Maurer married in December 1987. In early 1988, the two incorporated their company, MicroEdge Inc., later to become SlickEdit, in Virginia. All of the stock was issued to Clark Maurer and remained in his ownership until December 2001. The Company released its first product in 1988—an editor for programmers known as SlickEdit, which was intended to work on multiple computer platforms. The software was developed by Clark. Clark Maurer licensed the rights to the software to the Company on August 5, 1992, in exchange for an 8% royalty on all revenues the Company derived from the product's use. The royalties were paid to him individually until the license was terminated in 2001 and the intellectual property rights were transferred to the Company.

{17}    In the late 1990s, as the "tech bubble" grew, Jill and Clark decided to explore the possibility of selling the Company. They hired Paul Rasmussen to help them with those efforts and executed a written agreement documenting his role in selling the Company. That document explicitly stated that Mr. Rasmussen was to help sell the Company and based his compensation in part upon the price paid on a successful sale. After engaging in dialogue with many potential purchasers, including substantial discussions with 10 to 15 of them, Mr. Rasmussen was unable to present SlickEdit with an acceptable deal —partly because, as he testified at trial, Jill Maurer's expectations as to the value of the Company were unreasonably high. The agreement with Mr. Rasmussen was terminated in 1999. Soon after that, the "tech bubble" burst, and technology and software companies quickly began to lose their luster with investors.

{18}    In 2000, Jill Maurer met Andre Boisvert at a meeting for potential investment in another company. The two discussed SlickEdit and the possibility of Andre Boisvert becoming an advisor to the Company. Jill Maurer spoke with SlickEdit's attorney, Larry Robbins, who encouraged her to follow through with those discussions. Andre Boisvert was brought on as a consultant. The parties disagree as to why SlickEdit hired Mr. Boisvert. Jill Maurer claims that Mr. Boisvert was hired to help sell the Company. All others involved in the case who testified on the matter, including Clark Maurer, testified that their understanding was that he was brought in to help grow the Company.

{19}    Later that same year, Mr. Boisvert joined the SlickEdit Board of Directors. He became Chairman of the Board of Directors in 2001. In June 2000, Andre's wife, Erica Boisvert, was hired as the Chief Financial Officer for a spin-off company called NewTek, Inc. NewTek was designed to spin out a product similar to SlickEdit that would be used in a mainframe environment. Erica also initially did some accounting work for both NewTek and SlickEdit. When NewTek failed to get off the ground, Erica transitioned into full time employment at SlickEdit. Initially her role was to help with accounting matters, including getting the Company's books into compliance with General Accepted Accounting Principles ("GAAP").[1] Ms. Boisvert was promoted to Chief Operating Officer in January 2004. She eventually was named Chief Financial Officer of SlickEdit.

{20}     Jill Maurer testified that in the fall of 2001 she realized that her marriage was not working—a fact that she confided in Erica Boisvert.  Jill told Erica that she was considering leaving Clark.  They discussed the disruptive impact that a divorce between the co-founders could have on the Company.  The two talked with Andre about cleaning up the Company's documents in order to avoid conflict over the relative relationship between the Maurers and the Company.

{21}     Nearly ten years earlier, Clark Maurer had signed an agreement that provided for an 8% royalty payment on all revenues derived from the use of SlickEdit software.  On December 31, 2001, at the advice of Mr. Boisvert, he signed another document terminating that agreement and transferring ownership rights to the software to SlickEdit.  In return, both Clark and Jill Maurer signed employment agreements with SlickEdit which included, in addition to base salary, a provision for each to receive an annual bonus of 4% of the Company's licensing revenue.  Clark and Jill Maurer separated the same day.  They legally divorced on February 14, 2003.  After the divorce, both continued to work at the Company, but Jill's time was reduced due to her childcare responsibilities.

{22}     On January 1, 2002, Stock Purchase Agreements were issued, giving Andre and Erica Boisvert shares of company stock.  Andre Boisvert acquired 50,000 shares of newly-issued treasury shares for a promissory note in the amount of $90,500, giving him a 1% interest in the Company.  Erica Boisvert acquired 125,000 shares of newly-issued treasury shares for a promissory note in the amount of $226,500, giving her a 2.5% interest in the Company.

{23}     On July 1, 2002, Andre Boisvert acquired another 500,000 shares—giving him an additional 10% share of the Company—for a promissory note in the amount of $905,000.  This transaction was completed with unanimous approval of the Board of Directors. Plaintiff's expert, Randy Whitt, testified that the price paid was fair market value.  Jill Maurer claims that the impetus behind the transaction was a conversation with Mr. Boisvert in which he stated that he "needed more motivation" to sell the Company.  Following the January and July 2002 transactions, Clark and Jill Maurer each owned approximately 42.5% of the Company.  In September 2002, the Board of Directors voted unanimously to forgive a portion—nearly 50%—of Andre Boisvert's debt to the Company.  Jill Maurer testified that her reason for supporting that decision was again to provide the additional motivation Mr. Boisvert wanted in order for him to market the Company.

{24}     In early April 2004, Jill Maurer requested an estimate of SlickEdit's first quarter financials.  She needed money for taxes.  She got Clark to agree to a tax-free distribution to be made to both herself and Mr. Maurer to meet tax obligations including those derived from ownership of SlickEdit.  The other shareholders received distributions as well.  The Boisverts were particularly upset about the way in which Jill engineered the dividend and the cash flow of the Company.

{25}     Following a vote of the Board of Directors, plaintiff, herself a member of the Board, was terminated "without cause" as an employee of SlickEdit on April 20, 2004.  The Company continued to pay plaintiff her base salary for six months following her termination.  It discontinued her bonus payments, which were much greater than her salary, on April 30, 2004.  The cessation of those payments is the basis of Jill Maurer's claim under the Wage & Hour Act.

{26}     It is hard to conceive of a more dysfunctional corporate family than the officers, directors, and shareholders of SlickEdit.  Clark Maurer had all of the stock originally issued in his name, and the royalty contract provided all of the income to him.  Jill Maurer and the Boisverts rearranged the corporate structure to suit Jill when she knew she wanted a divorce but didn't tell Clark.  The Boisverts likely took

advantage of both Clark and Jill and manipulated both of them. Based on statements of the Boisverts, Clark thought Jill had taken advantage of him in the separation agreement by hiding the value and amount of jewelry she had purchased. Clark got even with Jill by terminating her employment and bonus. Jill retaliated by suing Clark, Erica, and Andre. Clark Maurer appeared incapable of any independent thought —being first manipulated by Jill and then by the Boisverts.

{27} Jill wanted the Company sold so she could cash out her interest at the highest price and complete her divorce from Clark. She still does. Clark and the Boisverts, on the other hand, derived greater value by keeping the Company going. The Company would be less marketable and less valuable without Clark, who created the software. If Jill and Clark could ever agree on anything, they have voting control. Absent their agreement, the minority shareholders hold the balance of power.[2]

III.

WAGE & HOUR ACT

{28} The Court first addresses plaintiff's claim for liquidated damages under the Wage & Hour Act. Having prevailed on the breach of contract claim at summary judgment, plaintiff now seeks to recover liquidated damages under the Wage & Hour Act for SlickEdit's failure to continue her bonus payments following her termination. N.C.G.S. §§ 95-25.1 *et seq.*

{29} The Wage & Hour Act was adopted with the following public policy in mind:

> The wage levels of employees, hours of labor, payment of earned wages, and the well-being of minors are subjects of concern requiring legislation to promote the general welfare of the people of the State without jeopardizing the competitive position of North Carolina business and industry.

N.C.G.S. § 95-25.1(b). With regard to payment of earned wages, the Act specifically requires employers to pay their employees "all wages and tips accruing on the regular payday." N.C.G.S. § 95-25.6. Any employer who fails to pay wages owed on the date they become due is liable to the employee for unpaid wages, plus interest. N.C.G.S. § 95-22.22(a). Furthermore, unless the employer demonstrates that its failure to pay the wages owed was in good faith, the Court may, in its discretion, "award liquidated damages in an amount equal to the amount found to be due." N.C.G.S. § 95-22.22(a1).

{30} At issue is whether the Wage & Hour Act applies here and, if so, whether plaintiff is entitled to liquidated damages. SlickEdit contends that plaintiff should not be entitled to recover liquidated damages for two reasons: (1) the Wage & Hour Act is inapplicable because the bonus payments here do not qualify as "wages," as defined under the Act, and (2) SlickEdit's decision to discontinue the bonus payments was made in good faith. In applying the Act, this Court must construe it liberally. N.C.G.S. § 95-22.25.

{31} First, SlickEdit argues that the Wage & Hour Act does not apply because the bonuses do not constitute "wages" under the Act. The Act defines "wages" as "compensation for labor or services rendered by an employee whether determined on a time, task, piece, job, day, commission, or other basis of calculation." N.C.G.S. § 95-25.2(16). The definition section of the Act also declares that wages shall include "sick pay, vacation pay, severance pay, commissions, *bonuses*, and other amounts promised when the employer has a policy or a practice of making such payments." *Id.* (emphasis added).

{32} Despite the fact that the Act explicitly defines wages to include bonuses, SlickEdit argues that the bonus owed here is not in fact a "wage" but instead a "recharacterized royalty." (Def. SlickEdit's Memorandum Regarding Wage and Hour Act and Breach of Contract Issues, at 7.) ("SlickEdit Wage & Hour Act Brief"). Consequently, SlickEdit argues, the bonus is not compensable under the Wage & Hour Act. *Id.* To assert that the bonus payments here did not constitute "wages" is more than a bit

disingenuous. SlickEdit made a consistent, deliberate business decision to pay the bonus as wages. It reported the bonus payments as wages in Jill Maurer's W-2 forms from 2002 to 2004, and it withheld Social Security and Medicare taxes from her bonus compensation. Moreover the bonus provision was created in plaintiff's Employment Agreement as *compensation* expressly given in consideration for services provided by plaintiff under the Agreement. Now, after years of representing the payments under the bonus provision as wages and treating them as such, SlickEdit has made an about-face in an attempt to avoid the consequences of its failure to honor its agreement with the plaintiff.

{33} The following is uncontroverted. The Boisverts convinced the Maurers that the ownership of the intellectual property needed to be in the corporation. By doing so, the Maurers lost their primary income stream, thus requiring that it be replaced by a bonus. Since the royalty was unrelated to an employment term but continued as long as the intellectual property was used, it makes sense that the employment contract provided that the replacement bonus based on net revenues would continue beyond termination.

{34} Jill Maurer and Erica Boisvert, the two people clearly responsible for the agreements, both knew what Clark Maurer did not: Jill wanted a divorce and wanted to ensure, before Clark knew about the divorce, that she got her half of the royalty stream. The employment contract took care of that need before Clark knew what was coming. Mr. Robbins, SlickEdit's attorney, did not know of the divorce plans, so it is not surprising that he did not know that someone had changed his form employment agreement to accomplish equitable distribution of the income stream from the intellectual property.

{35} While it is clear that this bonus arrangement was a substitute for royalty payments, that doesn't discount the fact that the Company explicitly chose the use of a bonus provided for in an employment contract and reported the bonus as wages for all tax purposes. It converted the royalty to a bonus which was part of the employment agreement for both Jill and Clark.

{36} SlickEdit likens the bonus payments to other forms of post-payment employment such as pensions and retirement benefits, which, it argues, are not covered by the Act. In support of this proposition, SlickEdit cites an unreported North Carolina Court of Appeals decision, *Whitley v. Horton*, which SlickEdit contends adopted a rule that the Wage & Hour Act does not cover forms of compensation that continue to be paid post-employment. (SlickEdit Wage & Hour Act Brief, at 7.) (citing *Whitley v. Horton*, No. COA 03-1459 (N.C. App. Feb. 15, 2005)). Such a broad characterization of that decision, however, fails to acknowledge the import of the factual context in which that decision was rendered.

{37} In *Whitley*, the trial court found that the plaintiff employees and defendant employer had agreed to an employment term of 60 days, which was cut short when the employer closed its business before the 60-day period had run. *Whitley*, No. COA 03-1459. The employer ceased payment of the employees' wages when the business closed, and the trial court held that the failure to pay the employees' *weekly salary* for the *unworked* days constituted a violation of the Wage & Hour Act. *Id.* The Court of Appeals reversed the trial court's holding on the ground that the employer had already paid the employees' salaries for time actually worked and that the unpaid wages corresponded to work that had not been performed. *Id.*

{38} Here, however, SlickEdit does not contend that the bonus payments are tied to work that has not yet been performed. More appropriately the payments are tied to a history of service to the corporation, dating back to its earliest days. It is utterly inconsistent for SlickEdit to have expressly provided in the employment agreement that the bonus payments would survive any termination to Ms. Maurer's employment and then to argue that those payments are necessarily tied to her continued performance under that contract. SlickEdit purposefully and consistently treated the bonus payments as wages and

intentionally chose not to tie those payments to future performance by Ms. Maurer under her employment contract. It cannot now successfully argue that the bonus payments are not wages.

{39}     SlickEdit argues that even if the bonus payments constitute "wages" under the Wage & Hour Act, liquidated damages are inappropriate here because the Company acted in good faith. The Wage & Hour Act states that if "the employer shows to the satisfaction of the court that the act or omission constituting the violation was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this Article, the court may, in its discretion" reduce the amount of liquidated damages or award none at all. N.C.G.S. § 95-25.22 (a1). The burden is on the employer to demonstrate good faith in its decision not to continue paying wages. *Hamilton v. Memorex Teltex Corp.*, 118 N.C. App. 1, 15, 454 S.E.2d 278, 286 (1995). Even if the employer demonstrates good faith, the trial court may still award liquidated damages. *Id.* If the employer fails to show good faith, however, the trial court has no discretion to reduce the amount of liquidated damages awarded. *Id.*

{40}     While Ms. Maurer received millions of dollars from SlickEdit in the years before the dispute arose, it is clear that termination of her employment coupled with cessation of the bonus payments created enormous leverage to force her to sell her minority stake at a discounted value. She was a single mother with custody of two children, both of whom required more than normal care. The loss of *all* of her income stream from the Company put her in a difficult position. It is also undisputed that Clark was angry with Jill over the divorce settlement. The Boisverts were angry with her for engineering the dividend behind their backs and interfering with their management of the Company. It was a situation ripe for retaliation.

{41}     SlickEdit claims that it showed good faith by acting on the advice of its legal counsel after contacting him to determine its legal obligations under Ms. Maurer's employment agreement. After SlickEdit's attorney, Larry Robbins, advised the Company that the issue of continuing bonuses under the contract was ambiguous, the Company decided to continue making the payments until the end of the month in which Ms. Maurer was fired.

{42}     The Court finds SlickEdit's argument that it acted in good faith by relying on the advice of its attorney unpersuasive. During discovery, SlickEdit invoked the attorney-client privilege when plaintiff attempted to solicit from Mr. Robbins his reasons for advising SlickEdit to terminate Jill Maurer's bonus. That stance was never abandoned and Mr. Robbins's deposition testimony was never revised until SlickEdit filed affidavits of Mr. Robbins, Mr. Millen, and Mr. Boisvert in support of its good faith argument.

{43}     Moreover, every witness who has been asked to look at the employment agreement has reached the conclusion that the bonus payments should have continued post-termination. *Maurer v. SlickEdit*, 2005 NCBC 4, ¶23. Larry Robbins himself, when asked about the provision at deposition, said that the bonus payments should have continued after Ms. Maurer was fired, and it is telling that SlickEdit amended Clark Maurer's employment agreement shortly after that deposition by removing the bonus survival clause. (Plaintiff's Memorandum Regarding Wage and Hour Act and Breach of Contract Damages, at 8-9 & Exh. 1.) ("Plaintiff's SlickEdit Wage & Hour Act Brief") (citing SlickEdit's Mar. 11, 2005 Board minutes). Furthermore, even after the Court held, in its August 12, 2005 Order, that the employment agreement required continued bonus payments, SlickEdit has continued to withhold the payments.

{44}     SlickEdit's argument that liquidated damages should be reduced because it acted in good faith is rejected, and plaintiff's request for liquidated damages equal to the amounts owed is, in the exercise of the Court's discretion, granted. Even if there was good faith on the part of the corporate defendant, the Court

would still exercise its discretion to award liquidated damages. Ms. Maurer was unfairly denied the bonus payments to which she was entitled.

## IV.
## JUDGMENT NOTWITHSTANDING THE VERDICT
### A.
### Legal Standard

{45}    Rule 50(b) of the North Carolina Rules of Civil Procedure provides, in relevant part as follows:

> Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the submission of the action to the jury shall be deemed to be subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; . . . [T]he motion shall be granted if it appears that the motion for directed verdict could properly have been granted. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the judge may allow the judgment to stand or may set aside the judgment and either order a new trial or direct the entry of judgment as if the requested verdict has been directed.

N.C.G.S. § 1A-1, Rule 50(b)(1).

{46}    The rules that apply in ruling on a directed verdict also apply when deciding on a motion for judgment notwithstanding the verdict—the motion is technically a renewed motion for directed verdict. *Harvey v. Norfolk*, 60 N.C. App. 554, 556, 299 S.E.2d 664, 666 (1983).

> Judgment notwithstanding the verdict should be granted only when the evidence is insufficient as a matter of law to support the verdict. Where the evidence admitted at trial, taken in the light most favorable to the non-moving party with all reasonable inferences drawn in his favor, is sufficient to support the verdict, it should not be set aside.

*Beal v. K. H. Stephenson Supply Company, Inc.*, 36 N.C. App. 505, 507, 244 S.E.2d 463, 465 (1978).

{47}    The Court may properly grant a motion for judgment notwithstanding the verdict where the evidence presented by the non-moving party is insufficient to support the verdict. *Brokers, Inc. v. High Point City Bd. of Educ.*, 33 N.C. App. 24, 234 S.E.2d 56 (1977). To withstand a motion for directed verdict, the party opposing the motion must provide actual proof:

> of such a character as reasonably to warrant the inference of the fact required to be established, and not merely sufficient to raise a surmise or conjecture as to the existence of the essential fact. . . . "[E]vidence which merely shows it possible for the fact in issue to be as alleged, or which raises a mere conjecture that it was so, is an insufficient foundation for a verdict and should not be left to the jury." . . . "Judges are no longer required to submit a case to the jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character as that it would warrant the jury to proceed in finding a verdict in favor of the party introducing such evidence."

*Lee v. Stevens*, 251 N.C. 429, 433, 111 S.E.2d 623, 627 (1959) (quoting *Byrd v. Express Co.*, 139 N.C. 273, 51 S.E. 851 (1905)). The motion should be denied if there is "evidence more than a scintilla to support plaintiff's prima facie case in all its constituent elements." *Clark v. Moore*, 65 N.C. App. 609, 610, 309 S.E.2d 579, 580 (1983).

{48}    This case presents an unusual interplay between the burdens of proof in fraud claims and punitive damage claims. Fraud must be proved by a preponderance of the evidence. *Oliver v. Hecht*, 207 N.C.

481, 486, 177 S.E. 399, 402 (1934). Recovery of punitive damages requires "clear and convincing" evidence. N.C.G.S. § 1D-15(a). It is a distinction with a difference. It makes sense to require a person seeking the extraordinary damages sanctioned by punitive award to establish that right by clear and convincing evidence while only having to establish the underlying claim by a preponderance of the evidence. That is true even though the underlying claim is a fraud claim. It may be that in most fraud cases the evidence which established fraud is so clear that it also reaches the level to support punitive damages. However, there can be situations—and this could be one of them—where the plaintiff could recover on a fraud claim and not be entitled to recover punitive damages. That is certainly the situation the pattern jury instructions contemplate. N.C.P.I. -- Civil 800.00; N.C.P.I. -- Civil 810.96. For that reason, the Court will first examine the evidence to support the underlying fraud claim and then apply the clear and convincing standard to the punitive damages claim.

B.

{49}    Defendant Andre Boisvert bases his motion for judgment notwithstanding the verdict on the grounds that the jury could not have reasonably found that plaintiff established the required elements of fraud. In fraud cases, the trial court may only grant a motion for judgment notwithstanding the verdict if the plaintiff fails to present evidence supporting her prima facie case "in all its constituent elements." *Rowan County Bd. of Educ. v. United States Gypsum Co.*, 332 N.C. 1, 16, 418 S.E.2d 648, 658 (1992).

{50}    In North Carolina, a prima facie claim of fraud consists of the following elements:

> (a) that defendant make a representation relating to some material past or existing fact; (b) that the representation was false; (c) that when he made it defendant knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (d) that the defendant made the false representation with the intention that it should be acted on by the plaintiff; (e) that the plaintiff reasonably relied upon the representation and acted upon it; and (f) that the plaintiff suffered injury.

*Bolick v. Townsend Co.*, 94 N.C. App. 650, 652, 381 S.E.2d 175, 176 (1989) (quoting *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 374 S.E. 2d 385 (1988)) (emphasis omitted). Defendant Andre Boisvert focuses on elements (a) (false representation), (e) (reasonable reliance), and (f) (damages). The Court will address each separately. Before doing so, it is important to note what plaintiff does not claim to be the underlying misrepresentation: plaintiff concedes that any claim based on the debt reduction is derivative and not the subject of this suit. (Tr. 925.)

1.    False Representation

{51}    Andre Boisvert claims that Jill Maurer failed to present sufficient evidence at trial of a false representation. To satisfy the false representation element, a certain level of specificity is required. North Carolina courts uniformly require that the representation be "definite and specific". *Harding v. Southern Loan & Ins. Co.*, 218 N.C. 129, 10 S.E.2d 599, 601 (1940). *See also Horack v. Southern Real Estate Co.*, 150 N.C. App. 305, 313, 563 S.E.2d 47, 53 (2002). Requiring this heightened level of specificity allows courts to distinguish "mere puffing, guesses, or assertions of opinions from representations of material facts." *Rowan County Bd. of Educ.*, 332 N.C. at 17, 418 S.E.2d at 659.

{52}    Andre Boisvert complains that the evidence here of a misrepresentation on the part of Mr. Boisvert, submitted exclusively in the form of the plaintiff's own testimony, does not give any indication that a specific or definite promise was made. Ms. Maurer testified at trial that in 2000 Mr. Boisvert was brought on board as an advisor on the *possible* sale of the Company:

Q. Did you – from that point forward, over the next, you know, month or so, did you and Mr. Boisvert talk about the possibility of him becoming an advisor to you?

A. We did. Andre and I ended up on the Board of Directors of [another] company together, and were able to talk to each other, got to know each other. And it was – I had been unsuccessful at selling the company. I was also looking at going into the mainframe market, which I didn't really know much about.

Q. Let me stop you, I'm sorry.

A. Yeah.

Q. Did – did Mr. Boisvert agree to advise you and Clark in the possible sale of the company?

A. He did. He started by saying that – that we probably needed investors. He looked at the financials. We didn't really – our goal was to sell the company, and he told me that – but I had been frustrated, because we tried to sell the company and it didn't work.

\* \* \*

Q. Well what – what did he want in exchange for agreeing to be an advisor to you in the possible sale of the company?

A. He wanted one percent of the company.

Q. When you say one percent, does that mean stock? Is that what he was talking about?

A. Stock, right, that he gain, he'd get paid when the company was sold.

\* \* \*

Q. Did you and Clark talk between yourselves . . . about whether to agree to associate Mr. Boisvert as an advisor for purposes of selling the company?

A. We did.

Q. And did you and Mr. Maurer agree with Mr. Boisvert at that time, that he should – that his request for ownership of stock should be honored?

A. We did.

(Tr. 142-44.) Ms. Maurer also testified that she and Mr. Boisvert again discussed his role in the Company in July 2002:

Q. Let's go up to July 2002. Did you have any discussion with Mr. Boisvert in about July 2002 about why the company wasn't selling?

A. I did. It was very important to me at this time that it did. I was on my own with the children. We – we had separated and it was important – it was important to me to sell the company.

Q. What was Mr. Boisvert's response to your questions about why the company wasn't selling?

A. He said that he wasn't motivated enough to sell the company, that he wanted – that in order for him to be motivated, he would need 10 percent of the company as opposed to one percent.

(Tr. 224.)

{53} The extent of Jill Maurer's testimony is that Andre Boisvert promised to be "an advisor in the *possible* sale of the company" and that in July 2002 he told her that, in order to be motivated to sell the Company, he would need 10% of the Company. Mr. Boisvert argues that this testimony falls far short of

demonstrating a specific or definite promise. Reading all of the evidence in a light most favorable to the plaintiff, the Court is inclined to agree.

{54} There was little evidence presented here as to any of the terms of Mr. Boisvert's promise. First, no representation was made that a sale would or should take place by any particular date. Jill Maurer herself testified that "we did not have an exact date in mind. We had the sense, you know, we – I certainly did not think it would take four years. I – I didn't think it would take that long." (Tr. 588.) Second, Ms. Maurer testified that Mr. Boisvert never promised to sell to a particular type of company. (Tr. 600.)

{55} Furthermore, plaintiff presented no evidence that Mr. Boisvert promised to try to sell the Company for any particular price. On cross examination, Ms. Maurer's testimony as to the intended price was as follows:

Q. Now he – and he never promised that he would – he would sell it for a particular price, right?

A. Not necessarily for a particular price, we discussed sort of a range of prices.

Q. Did he promise you he'd sell it within that range?

A. He promised that he would try to sell within that range.

Q. What was that range?

A. The number that we had talked about was 20 million, and I don't remember at the time if we had said, you know, like 15 to 25, I don't really remember.

* * *

Q. But he never promised you that he could sell it for $20,000,000, did he?

A. He said that he had the capabilities, that he was – he – you know, that he was one of the best people that we could have to – to work to help us do that.

Q. But that's different than promising to sell it for $20,000,000, right?

A. He promised to actively try to sell to [sic] for that.

Q. Well –

A. You know, if you're trying to say did he absolutely guarantee that he could do that, he didn't do that. He definitely said that he had the capabilities to do it.

(Tr. 588-89.) According to plaintiff's own testimony, Mr. Boisvert never stated that he would sell for a particular price or even within a given price range other than that he "had the capabilities" to sell the Company somewhere in the $20,000,000 range. [3]

{56} At best, plaintiff bases her claim of fraud on a side agreement between herself and Andre Boisvert that he would work as "an advisor in the possible sale of the company"—a promise that was neither reduced to writing nor reflected in any corporate documents, including Mr. Boisvert's stock purchase and consultant agreements. According to the plaintiff herself, there was no agreement as to any time frame within which the sale should take place, or that Mr. Boisvert would sell for a particular price or range of prices, other than that he "had the capabilities" to do so.

{57} An alleged promise is not definite and specific if there is no evidence of the terms of the agreement. *See Horack v. Southern Real Estate Co*., 150 N.C. App. 305, 313, 563 S.E.2d 47, 53 (2002). In *Horack*, the plaintiff was a commercial real estate broker who sued his former employer and another broker who had been one of his co-workers at that company. The plaintiff claimed that he was defrauded when the broker failed to honor an alleged agreement to share the commission from a transaction on which

he had worked when he was still with the company. The trial court ruled in favor of the broker on his motion for directed verdict, and the North Carolina Court of Appeals affirmed that decision on the ground that the plaintiff had failed to demonstrate that the misrepresentation was definite or specific. In so holding, the Court noted that "[t]here was no evidence detailing the terms of plaintiff's commission on the . . . transaction under the alleged separate agreement, especially those terms concerning the amount of that commission." *Horack*, 150 N.C. App. at 313, 563 S.E.2d at 313.

{58}     Here, as in *Horack*, there is little clarity as to the terms of the alleged promise. There is no evidence that Mr. Boisvert was to sell the Company by a certain date. There is no evidence that he represented that he could or would sell the Company for a given price or an amount within a specified price range. There is no indication as to whether the alleged promise was contingent on Mr. Maurer's approval of a general plan to sell the Company or of any specific transaction—which all agree would be required in order to sell the Company. Plaintiff's testimony indicates that Mr. Boisvert agreed to "advise" SlickEdit in its efforts to sell the Company and that he stated that he was "capable" of selling the Company within a certain price range. Even ignoring the mountain of evidence—in the form of Company documents and the testimony of every other person involved in SlickEdit management—that consistently indicates that Mr. Boisvert was brought in for purposes other than to sell the Company, plaintiff's evidence fails to demonstrate that a definite and specific representation was made by Andre Boisvert which might serve as the basis for a fraud claim.

2.     Reasonable Reliance

{59}     Even had plaintiff offered sufficient proof of false representation, Defendant Boisvert argues, Ms. Maurer failed to establish that she reasonably relied and acted on that misrepresentation. For a fraud claim to be actionable, a plaintiff must prove that she reasonably relied on the false representation to her detriment. *See Wall v. Fry*, 162 N.C. App. 73, 78, 590 S.E.2d 283, 286 (2004). Generally, the issue of whether the complainant relied reasonably on another's false representation is a question for the finder of fact. *Olivetti Corp. v. Ames Bus. Sys., Ins.*, 319 N.C. 534, 544, 356 S.E.2d 578, 584 (1987).

{60}     In order to properly address this issue, it is helpful for the Court to consider separately the specific points in time at which the plaintiff alleges the false representations were made: 1) the initial hiring of Andre Boisvert in 2000; 2) the second issuance of stock to Andre Boisvert in July 2002; and 3) SlickEdit's decision in September 2002 to reduce Mr. Boisvert's debt by half.

{61}     With regard to the initial hiring, plaintiff's evidence failed to indicate any reliance whatsoever on the part of Jill Maurer. Ms. Maurer alleges that Andre Boisvert first represented that he would help to sell SlickEdit in 2000 when he was hired as a consultant. It should first be noted that Ms. Maurer was not yet a shareholder at SlickEdit at the time, so she was not even in a position to rely *detrimentally* on the promise.

{62}     Furthermore, Ms. Maurer's actions, when contrasted with an earlier effort to sell SlickEdit, show a failure to actually rely on such a promise by Andre Boisvert. At the time of the alleged promise, SlickEdit had recently ended an engagement with Paul Rasmussen under which Mr. Rasmussen was helping to sell the Company. Mr. Rasmussen had been brought on as an advisor to SlickEdit, and a written contract was executed explicitly stating that his responsibility was to sell the Company. That agreement stated that Rasmussen would be compensated at an hourly rate and that he would receive a commission on a scale of 2-6% upon the completion of a successful sale.

{63}     In relying on the agreement with Mr. Rasmussen, plaintiff knew exactly what to do, and she did just that.  She reduced the promise and the terms of the agreement to writing.  Here, however, instead of acting in reliance on Mr. Boisvert's promise, she acted altogether inconsistently with such an agreement.  Rather than reducing the alleged promise to writing, Jill Maurer, on behalf of the Company, had consulting and restricted stock purchase agreements executed which failed altogether to state that Mr. Boisvert was being brought in to help sell the Company.  Those agreements, signed by the plaintiff herself, instead point to a different role for Mr. Boisvert—to help *grow* the Company.

{64}     Likewise, plaintiff has failed to establish reasonable reliance as to the issuance of a 10% share of the Company in July 2002.  Plaintiff's own expert, Randy Whitt, testified that the $1.81 per share valuation, reflected in the promissory note that was given in exchange for the 10% share, was an appropriate price. (Tr. 844.)  This was based on his determination that the corporation at the time was valued at approximately $9,000,000. (Tr. 827-28, 850-59.)  Had Mr. Boisvert's role been to sell the Company and had the corporation sold at that time at its fair market value, he would have received nothing for his services.  It would have been patently unreasonable for Ms. Maurer to rely on an alleged promise by Andre Boisvert to work to sell the Company with full knowledge that he would receive no compensation for doing so.

{65}     This leaves only the decision by the Company in September of 2002 to reduce Andre Boisvert's debt to the Company by half.  Ms. Maurer's reliance on this occasion was far from reasonable.  Ms. Maurer was unreasonable in relying on a secret agreement with Mr. Boisvert and affirmatively misrepresenting to the Board why the debt forgiveness was being sought.  Ms. Maurer put forward the motion at the September 23, 2002 board meeting, and she testified at trial that her reason for doing so was to provide more motivation for Mr. Boisvert to sell the Company.  No mention is made in the minutes from that board meeting, however, that that objective was ever stated as the basis for the debt forgiveness.  In any event, Ms. Maurer does not claim that promise is the one upon which she is suing for fraud.  *See supra* ¶ 71.

{66}     Throughout the entirety of Ms. Maurer's relationship with Mr. Boisvert, it would have been unreasonable for her to rely on a side agreement with Andre Boisvert that was inconsistent with the mission of the corporation and the goals of the majority of SlickEdit's Board of Directors.  A fraud claimant cannot reasonably rely on a promise with full knowledge that the promisor is without the power to carry out the promise.  *See Horack*, 150 N.C. App. at 313, 563 S.E.2d at 53 (holding that the plaintiff could not have reasonably relied on the defendant's misrepresentations where she was aware that the defendant did not have the authority to fulfill the promise).

{67}     Jill Maurer was fully aware that neither she nor Andre Boisvert had the power to sell the Company without approval of the other directors.  Ms. Maurer herself testified that were the Company to be sold, such sale would have to be approved by Clark Maurer. (Tr. 597.)  Clark Maurer testified that after the engagement with Paul Rasmussen failed, his understanding was that in order to consider selling the Company at some point in the future, the business would have to grow first (Tr. 726.)  He further testified that his understanding was that Andre Boisvert was brought in to do just that, stating that SlickEdit "didn't bring [Andre] in to sell the company at any point in time."  Similarly, Howard Lewis—the only member of the Board of Directors other than the Maurers and the Boisverts—testified that the corporation's primary strategy at the time was to grow.  Ms. Maurer, herself an officer and director at SlickEdit, was no doubt aware that Andre Boisvert owed fiduciary duties of due care, loyalty, and candor to the Company

which would obligate him to work to execute the goals of the corporation and not her own personal wishes.[4]

{68}      Ultimately, it was simply unreasonable for Jill Maurer to rely on an alleged promise to sell the Company where there was no agreement as to target price, target time frame, strategy to take in accomplishing that task, compensation for doing so, or even the power to carry it out.  The Court therefore concludes that plaintiff failed to introduce sufficient evidence of reasonable reliance to support the verdict.


3.      Damages

{69}      Andre Boisvert also argues that the verdict is not supported by competent evidence of actual damages recoverable in a direct action.  Proof of actual damages is an essential element of a claim of fraud.  *See Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 589-90, 581 S.E.2d 68, 76-77 (2003) (citing *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988)).

{70}      Again, it is helpful for the Court to consider separately the specific points in time at which the plaintiff alleges the false representations were made:  1) the initial hiring of Andre Boisvert in 2000; 2) the second issuance of stock to Andre Boisvert in July 2002; and 3) the corporation's decision in September 2002 to reduce Mr. Boisvert's debt by half.  In 2000, when Andre Boisvert received the first 1% of SlickEdit stock, Ms. Maurer was not a shareholder and therefore was not in a position to be damaged, either directly or indirectly by the transaction.

{71}      The third event, the forgiveness of half of Mr. Boisvert's debt, cannot serve as the basis for damages here.   The Court previously ruled, in its May 16, 2005 Order, that a claim on any injury arising out of that event would belong to the corporation and not to the plaintiff individually.  *Maurer v. SlickEdit, Inc.*, 2005 NCBC 1, ¶63.  The parties themselves stipulated that, if wrongful, the debt forgiveness resulted in injury to the corporation and not to the plaintiff herself.  Plaintiff's counsel acknowledged this both before the jury at trial and during oral arguments on the post-trial motions. (Tr. 925.) ("I think the loan forgiveness claim, if we have that claim, yeah, it's derivative, just like Mr. Millen said.".)  The Court also instructed the jury that the forgiveness of the promissory note could not serve as the basis for an award of damages.

{72}    Only the second event—the sale of a 10% interest in SlickEdit in July, 2002—remains.  As to that event, plaintiff claims that she was harmed when her percentage ownership of SlickEdit diminished to 42.7% as a result of SlickEdit's decision to issue 500,000 treasury shares to Andre Boisvert on July 1, 2002.  As is always the case when a corporation issues new shares of stock, all of SlickEdit's shareholders at the time, including Jill Maurer, Clark Maurer, Erica Boisvert, and Howard Lewis, saw a dilution in their *percentage* ownership when those shares were issued.

{73}      Courts that have awarded damages for dilution of ownership percentage have done so where the recipient paid less than the *actual value* of the stock.  *See, e.g., Stone v. Martin*, 85 N.C. App. 410, 355 S.E.2d 255 (1987) (affirming the trial court's cancellation of the defendant director's stock where the trial court found he caused the corporation to issue shares of stock to himself for *no* consideration); *US v. NASD, Inc.*, 422 U.S. 694, 708 n. 17 (1975) ("The existing shareholders' equity interests were diluted because the incoming investors bought into the fund at less than the actual value of the shares at the time of purchase."); *Rosenbaum v. McAllister*, 64 F.3d 1439, 1446 (10th Cir. 1995) (stating that "to the extent the corporation received less than fair value for the shares sold to the class members it diluted the value of

the stock held by the other common shareholders").

{74}     While all of SlickEdit's shareholders experienced a loss of percentage ownership, none lost *value* as a result of the transaction because the shares were given in exchange for an amount equal to the actual value of those shares.   In exchange for the 500,000 shares, Andre Boisvert gave the corporation a promissory note in the amount of $905,000 plus interest.   Plaintiff's expert witness testified that the $905,000 amount, based on a per share valuation of $1.81, was fair market value.

{75}     Therefore the amount given by Mr. Boisvert was equal to the value of the stock received.   Even if the transaction was caused by a fraudulent misrepresentation by Mr. Boisvert, there were no actual damages to either SlickEdit or its shareholders, because equal value was added to the corporation and indirectly to the shareholders, including Jill Maurer.   As the value given was equal to the value received, there are no pecuniary losses on which to base a claim for damages.  *See Wall v. Fry*, 162 N.C. App. 73, 78-79, 589 S.E.2d 283, 286-87 (2004) (affirming dismissal of the plaintiff's fraud claim where the value received in the allegedly fraudulent transaction was equal to the value given).

{76}     Even if the transaction had caused damages to SlickEdit directly and to its shareholders indirectly, however, plaintiff would not be the proper party to recover.   The transaction complained of here was between the corporation and one of its board members.   Any resulting injury would have been to the Company directly, and a claim for damages on that injury would properly be brought by the Company itself—not one of its minority shareholders.  *See Aubin v. Susi*, 149 N.C. App. 320, 560 S.E.2d 875 (2002) (holding that a minority shareholder cannot maintain a fraud action for her own individual recovery without "a showing that she has sustained 'a loss peculiar to herself'" and affirming dismissal of the plaintiff's fraud claim because she failed to show a sustained loss different from that sustained by the corporation) (quoting *Outen v. Mical*, 118 N.C. App. 263, 266, 454 S.E.2d 883, 885 (1995)).[5]   The Court therefore must conclude that the plaintiff failed to present sufficient evidence of actual damages to support the verdict.

{77}     The problem confronting the Court is that the only possible sustainable case of fraud that the evidence discloses is based upon a claim which is derivative and based upon a conspiracy to deceive the other directors and shareholders.   The evidence supported a finding that Andre Boisvert promised Jill Maurer that if his debt were reduced he would work to sell the Company and that he did not intend to do so at the time he made the promise.[6]   Neither Jill Maurer nor Andre Boisvert disclosed that deal to the other shareholders and directors.   Instead Jill made the motion based upon Andre's past contributions to the Company and the other directors—all of whom were opposed to selling the Company—went along.   It was the Company which lost the asset, not the shareholder, and Jill Maurer was affected in precisely the same way that all the other shareholders were affected.   Jill had no incentive to vote for the debt reduction —other than to support her personal interest in seeing the Company sold.    Defendant Andre Boisvert's motion for judgment notwithstanding the verdict should be granted.

C.

{78}     In North Carolina, punitive damages may only be awarded if the plaintiff proves compensatory damages and the jury finds the presence of one of the following aggravated factors relating to the injury for which compensatory damages were awarded:  (1) fraud, (2) malice, or (3) willful or wanton conduct.   N.C.G.S. § 1D-15(a).   The existence of the aggravating factor must be proved by clear and convincing evidence. N.C.G.S. § 1D-15(b).   The clear and convincing standard is greater than the general preponderance of the evidence standard—it requires evidence "which should 'fully convince.'"  *Schenk v.*

*HNA Holdings, Inc.*, 613 S.E.2d 503, 508 (2005) (quoting *In re Smith*, 146 N.C. App. 302, 204, 552 S.E.2d 184, 184 (2001)).

{79}     Here, the jury found that the evidence of fraud on the part of Andre Boisvert warranted an award of punitive damages in this case. The Court finds that the evidence presented to support this conclusion is far from clear and convincing.

{80}     Plaintiff testified at trial that an agreement was struck between her and Andre Boisvert in 2000 whereby Mr. Boisvert would work to sell the Company. She also testified that that agreement was reinforced when a 10% stock interest was issued in July 2002 to provide "more motivation" for Mr. Boisvert to sell the Company. Neither agreement was reduced to writing nor was either confirmed by evidence of action on the part of either party in conformity with such an agreement.

{81}     Jill Maurer's former husband and SlickEdit co-founder Clark Maurer testified that he had no knowledge that such an agreement ever even existed. Mr. Maurer and Howard Lewis, SlickEdit's President at the time of the 2002 stock issuance, both testified that their understanding was that Andre Boisvert was being compensated for his efforts to help *grow* the Company. Neither Mr. Maurer nor Mr. Lewis was under the impression that Mr. Boisvert's role in the Company was to position it for sale.

{82}     The Company's attorney, Larry Robbins, who drafted the Stock Purchase Agreements, also had no knowledge of any such agreement. Robbins was told, and it was his understanding, that the Company's strategy was to grow the Company. At trial, Robbins testified as follows:

> Q.     Did Ms. Maurer tell you, in this year 2000 time period, that she had invited Mr. Boisvert to join the board in order for him to sell the company?
>
> A.     No.
>
> Q.     Let me expand on the question, the time period and question. Did she tell you at any time from the year 2000 to the time that she was terminated by SlickEdit in April 2004, that Mr. Boisvert had agreed to sell the company for her?
>
> A.     No.
>
> * * *
>
> Q.     [W]as it your understanding in this year 2000 time period, that the overall strategy that was being discussed was a growth strategy?
>
> A.     Yes, sir.

(Tr. 951, 953.)

{83}     The Restricted Stock Purchase Agreements themselves, which were executed by Ms. Maurer on behalf of the Company, specifically state that Mr. Boisvert's "relationship with the company is important *for its growth*." Plaintiff's Exh. 21 (Restricted Stock Purchase Agreement) (emphasis added). The consultant agreements, executed between SlickEdit and Andre Boisvert in January 2002 and July 2002, state that Mr. Boisvert's duties were to "[a]ssist senior management in identifying key strategic alliance partners" and, once those partners were identified, to "assist senior management in getting these key alliance partners to license SlickEdit's technology either under a VAR or OEM agreement." Plaintiff's Exh. 10 (Agreement for Individual Consultant, Exh. A); Plaintiff's Exh. 11 (Agreement for Individual Consultant, Exh. A). Even though the second of these agreements was signed by both Jill Maurer and Andre Boisvert and executed in the same month as the second alleged promise, no mention is made of any duty on the part of Mr. Boisvert to work to sell the Company.

{84}     Paul Rasmussen, who had previously been engaged by the Maurers to help sell SlickEdit, testified

that he spoke with Ms. Maurer concerning Mr. Boisvert's role at SlickEdit at the time the initial agreement was made with Mr. Boisvert. His testimony as to that conversation was as follows:

Q.     After your engagement ended, did you ever have occasion to speak with Ms. Maurer concerning some dealings that she was beginning to have with Andre Boisvert?

A.      Yes. Yes. I did. I -- I did have a conversation with -- with Jill about Andre, that she was considering bringing Andre in and she -- she knew that I knew him and not well, but I knew of him. And she told me that she was bringing him in for strategic reasons. The intent was not to sell the company, it was just for strategic reasons, and some of the things that they wanted to do and expand the business and so on.

Q.      Do you recall her specifically telling you that her intent in bringing Mr. Boisvert into the company was not to sell the company?

A.      She said they had changed their mind. They weren't going to sell the company and there were strategic things they wanted to do to grow the company.

Q.      Did she ever, at any time, tell you that her reason for bringing him to the company was to sell the company?

A.      Nope.

(Tr. 1159-60.)

{85}     Another factor that makes it difficult to find clear and convincing evidence to support a punitive damage claim is the exoneration of Erica Boisvert by the jury. The jury had to find that there was no fraud in any of the transactions involving her. The one conversation she had no part of was the one between Andre and Jill on debt reduction. The jury did not find any long running conspiracy between Erica and Andre to defraud Jill.

{86}     There is simply no clear and convincing evidence that a valid agreement under which Andre Boisvert would work to sell the Company ever existed, and there is an abundance of evidence to the contrary. While the plaintiff herself claims that such an agreement was reached, she presented no evidence whatsoever indicating a target sale date or that a price target was ever discussed. Other than the plaintiff's own testimony, there is no evidence that Andre Boisvert was hired by SlickEdit to help sell the Company. All other evidence, including agreements executed by the plaintiff and testimony from every person involved in acquiring and retaining Mr. Boisvert's services, points to the conclusion that Andre Boisvert was brought on board for strategic purposes—to help grow the Company, not to market it for sale. Plaintiff's evidence of fraud on the part of Andre Boisvert falls far short of being clear and convincing, and for that reason, Defendant Boisvert's motion for judgment notwithstanding the verdict, insofar as it relates to the punitive damages award, should be granted.

{87}     In summary, the following factors, most of them uncontroverted, militate against a finding of clear and convincing evidence:

1)  The jury verdict exonerating Erica Boisvert;

2)   Plaintiff's expert's testimony that the fair market value of the Company was 9 million dollars rather than 20 million dollars;

3)    The animosity between the Maurers, which made any agreement on management of the Company problematic;

4)   The necessity for Clark Maurer, who was the creative force behind the design of the software, to agree to any sale;

5)   The written Company minutes, unobjected to by plaintiff, which referred to the plans to grow

the Company;

6) The testimony of non-party witnesses like Mr. Robbins and Mr. Rasmussen that they were told that the plan was to grow the Company;

7) The contrast between the written brokerage agreement with Rasmussen and the oral agreement relied upon by plaintiff;

8) The secretive nature of the agreement between Jill and Andre;

9) The lack of any financial incentive for Andre Boisvert to work to sell the Company until the debt reduction;

10) The financial benefit to the Boisverts of Erica remaining employed by the Company;

11) The absence of any offers for the Company prior to the tech bubble bursting and the change in the market after the bubble burst;

12) Plaintiff's inability to specify a timeframe, price, or other conditions of sale which Andre Boisvert was obligated to fulfill; and

13) The absence of any evidence that this one product Company which competes against free open-source products could be sold at all.

{88}    Even if the appellate courts were to find that Jill Maurer had a direct claim for the fraudulent inducement of her support for Andre's debt reduction, there remain two troubling aspects of the jury verdict.  First, the award of actual damages of $452,500 gives the full compensation to Jill and all of the other shareholders and the corporation do not recoup any of their loss.  Second, the award of punitive damages to Jill for Andre's reneging on a secret agreement concealed by Jill from the other shareholders and directors rewards equally reprehensible conduct on her part.  This Court has trouble sustaining an award of punitive damages under those circumstances.  To do so is to reward conduct that amounts to a breach of fiduciary duty. Also, where the party injured knows that she is participating in a secret deal purposely hidden from other shareholders and directors, there cannot be clear and convincing evidence of reasonable reliance required to sustain punitive damages.

{89}    Finally, where, as here, a director proposes corporate action for which she has a personal interest or agenda, there exists a duty of loyalty and a duty of candor to the corporation and the other directors to disclose the personal interest.  In this case, Jill Maurer failed to comply with that duty.  Undoubtedly, she believed Clark could be persuaded to sell if both she and Andre were influencing him, but there was a duty to disclose her agreement and self-interest when she made the motion to reduce Andre's debt.  Her failure to comply with her duty of loyalty and candor should bar her from recovering punitive damages.  It would also serve as a bar to a claim for fraud based on the debt reduction.  Even if the fraud claims were sustained, this Court would conclude that plaintiff did not meet her burden of proof of clear and convincing evidence on the punitive damage claim.

{90}    If directors A and B conspired to usurp a corporate opportunity and A later declined to give B her share of the profit from the usurped opportunity, would the courts of North Carolina enforce the agreement made in breach of the fiduciary duties of A and B?  The Court does not believe they would.  This situation is no different; an award of punitive damages would be contrary to public policy.

V.

NEW TRIAL

{91}    Defendant Boisvert, as an alternative to his motion for judgment notwithstanding the verdict, has moved for a new trial under Rule 59 of the North Carolina Rules of Civil Procedure.  Under N.C.G.S. §

1A-1, N.C. R. Civ. P. 50(c)(1), if a motion for judgment notwithstanding the verdict is granted, "the Court shall also rule on the motion for new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion." *See Cox v. Steffes*, 161 N.C. App. 237, 246, 587 S.E.2d 908, 914 (2003).

{92}    Andre Boisvert argues that certain objectionable evidence introduced at trial "distorted and overwhelmed the trial proceedings in a way that plainly influenced the jury's verdict." (Defendants Brief in Support of Post-Trial Motions, at 21.) Specifically, Mr. Boisvert complains about the following categories of evidence: evidence of plaintiff's termination, Mr. Boisvert's role in the termination, the forgiveness of Mr. Boisvert's debt to the Company, his past dealings with another company (CIP), personal information concerning the plaintiff and Clark Maurer, and Mr. Boisvert's alleged attempt to corrupt a designated witness.

{93}    The Court has determined that if the jury verdict is upheld by the appellate court, Mr. Boisvert's asserted grounds for new trial should be denied. The Court has carefully reviewed Mr. Boisvert's asserted grounds for new trial and believes that they are without merit. The parties to this drama have woven a mesh of deception, intrigue, domestic squabble, corporate infighting, greed, and oral agreements that made it impossible to understand the claims and defenses without seeing the whole picture. Thus, evidence of plaintiff's termination, Mr. Boisvert's role in it, the forgiveness of his debt, the Maurer's domestic dispute, and the Boisverts' involvement therein are relevant parts of the overall picture. Mr. Boisvert's past dealings with CIP and the disagreements between the shareholders of that Company were an unfortunate sideshow, but not prejudicial. The fact that Mr. Boisvert was unwise and arrogant enough to contact a witness for the plaintiff without consulting his own counsel is not grounds for a new trial.

{94}    Finally the Court notes the issue of plaintiff's counsel's conduct concerning contact with a sequestered witness.[7] Although the Court finds that conduct improper, it was not sufficiently prejudicial to warrant a new trial.

VI.

CONCLUSION

{95}    This case presents a classic example of how not to run a corporation. Defendant Andre Boisvert probably did mislead Jill Maurer about what he would do for her personal interests. His misrepresentations do not rise to the level of actionable fraud, at least as would support a claim by her directly as opposed to the corporation. She has not established any damages or reasonable reliance. Even if there exists a sustainable fraud claim, the evidence was not of a clear and convincing nature to support punitive damages.

{96}    The Court exercises its discretion to invoke liquidated damages under N.C.G.S. § 95-22.22(a1). It is difficult to find that anyone involved in this dispute has acted in "good faith". Certainly, the decision to cut off all of Mrs. Maurer's income was not made in good faith. Even if it was made in good faith, the Court's decision would be the same.

{97}    The posture of this case prevents the Court from reaching an equitable solution to the disputes between the parties. The ideal, equitable, and just result here would be for Mr. Boisvert to turn his stock back to the corporation and to have his debt cancelled. If the corporation, or a majority of its shareholders, wished to employ Mr. Bosivert for any purpose it could do so with a written contract spelling out his duties and compensation. He could choose not to be affiliated with the Company in any way—a wise course in the Court's view. Unfortunately, the Court has not found a sound legal basis for invoking that

kind of equitable relief given the posture of the case.  It would welcome any opportunity provided by the appellate courts.[8]

{98}     The Court has considered another possibility—ordering a remittitur reducing the award to plaintiff to $184,875.  That would represent Jill Maurer's 42.5% of the $435,000 debt reduction.  It would compensate her for her ownership percentage of the debt reduction.  It would eliminate the punitive damages for the reasons cited in this opinion.  It would have the benefit of making Andre Boisvert pay damages to her for misleading her about his intent without permitting her to recover actual damages that belong to the corporation or other shareholders, and it would not allow her to recover punitive damages in a situation where she may have breached her fiduciary duty to the corporation.  The problem is that her claim for that fraud is derivative—as her counsel has conceded.

{99}     The parties have failed in two attempts at mediation.  If the appellate courts find that there is a valid fraud claim on the record in this case, this Court does not believe a new trial is warranted.  Even after the appellate process has run its course years from now, this corporation will remain adrift until the parties reach some agreement about its future and their respective roles in it.

{100}   Based upon the foregoing, it is hereby ORDERED, ADJUDGED and DECREED:

1.      Plaintiff's claim for liquidated damages under the North Carolina Wage and Hour Act is GRANTED and Defendant SlickEdit shall pay liquidated damages equal to the total amount owed under plaintiff's Employment Agreement.

2.      Defendant Andre Boisvert's motion for judgment notwithstanding the verdict on plaintiff's fraud claim is GRANTED.  Judgment is hereby entered dismissing plaintiff's claim for fraud against Andre Boisvert.

3.      Defendant Andre Boisvert's motion for judgment notwithstanding the verdict on plaintiff's punitive damages claim is GRANTED.  Judgment is hereby entered dismissing plaintiff's claim for punitive damages.

4.      Alternatively, Defendant Andre Boisvert's motion for a new trial is DENIED.

IT IS SO ORDERED, this the 3d day of February 2006.

---

[1]      Ms. Boisvert testified that when she began work on cleaning up the company's books, she discovered that the company had a significant cash problem.  In January 2001, for instance, Erica discovered that the company was left with less than one month of operating capital after Jill Maurer wired a substantial sum of money from the company to her personal account.

[2]      Even if the verdict against Andre Boisvert is upheld and paid, Andre, Erica, and Howard Lewis will control over 14% of the Company's outstanding shares.  Erica Boisvert will remain as CEO.  Andre, Clark, and Howard will still control the Board of Directors, and Clark will remain the Chief Technology Officer and architect of the software product.

[3]      Mrs. Maurer knew that there had been no interest in buying the company in the twenty million dollar range when it was listed with Mr. Rasmussen.  In the interim the tech bubble had burst and technology companies had lost their luster.  She agreed to sell Mr. Boisvert stock at fair market value—valuing the entire company at $9,000,000.  It is not reasonable to rely on a promise to sell at more than double fair market value.  There is no evidence in this record that the company could be sold, much less that it could be sold at a price far in excess of fair market value.

[4]    While it was clear to everyone that Jill Maurer wanted the Company sold for personal reasons, this record is devoid of any evidence that she disclosed her agreement with Andre Boisvert—to reduce his corporate debt in return for his promise to sell the Company—with any other director or shareholder.  It was an undisclosed side deal.

[5]      A recent case out of the Delaware Supreme Court drew a distinction between direct and indirect harm in determining

whether a case is direct or derivative or direct in nature. In *Tooley v. Donaldson Lufkin & Jenrette, Inc.*, the Court adopted a 'direct harm' approach, ruling that "the stockholder must allege something other than an injury resulting from a wrong to the corporation." 845 A.2d 1031, 1035 (Del. 2004). The Court also looked at whether the resulting relief should properly go to the corporation or the individual owners. *Id.* at 1036. For a discussion of the "direct harm" approach and its subsequent application in other jurisdictions, see Daniel S. Kleinberger, *Direct Versus Derivative and the Law of Limited Liability Companies*, 58 Baylor L. Rev. (forthcoming Winter 2006) (manuscript at 46-48). Under such an analysis, plaintiff's fraud claim would clearly fail here as the alleged injury was to the corporation directly, and Ms. Maurer has not presented evidence of any injury other than that flowing indirectly from harm to the corporation. While the Court finds such an analysis instructive, it does not base its decision today on the *Tooley* "indirect harm" approach. The Court leaves consideration of the merits of the *Tooley* approach for another day.

Had SlickEdit opted to bring suit against Mr. Boisvert (or had plaintiff brought a derivative action on behalf of the corporation), perhaps a more appropriate and equitable remedy, rather than allowing the shareholders to recover individually, would be to require Mr. Boisvert to turn his shares back in to the corporation in return for the cancellation of the promissory note. That, of course, is beyond the scope of this Order.

[6] If that was the conclusion reached by the jury, the Court concurs in that finding. Andre Boisvert's testimony on this issue is significant. He could not testify as to why Jill Maurer made the motion or any conversation about it, leaving the jury with only her explanation of what happened. There was evidence to support a finding that he did not intend to keep the promise. His wife derived all of her income from managing the company—an income likely to be lost in a sale. Shortly after the debt forgiveness, Andre Boisvert engineered Jill's termination, and his wife was one of the principal beneficiaries of that move. He expressly voted to grow the company rather than sell it, and there had been no change in circumstances in the interim.

It should be clear, even from a cold record, that Andre Boisvert made a terrible witness. He was arrogant, argumentative, evasive, unresponsive at times, and there was every reason for the jury to doubt his credibility. The Court is convinced that he did get Jill Maurer to support reducing his debt on the promise he would support her personal interest in trying to sell the company. He was smart enough to know that the value of his shares would not exceed the debt he owed for them unless his debt was substantially reduced. In obtaining the debt reduction, he was insuring that he would get something if the Company were sold at fair market value. Jill Maurer had no incentive to vote for the reduction other than her personal interest in selling the Company.

The Court believes, as it appears the jury believed, that Andre Boisvert did make that promise and failed to fulfill it and that there was evidence to support a finding that he never intended to fulfill it. That is not a claim upon which Jill Maurer may recover —at least not in the amount found by the jury. It is also a claim that places her in breach of her fiduciary duty to the corporation, and, as discussed above, it is a claim upon which no reasonable reliance could be found because it would have placed Andre Boisvert in breach of his fiduciary duty as a director.

[7] On August 24, the third day of trial, plaintiff called two witnesses who had previously worked with Mr. Boisvert. Prior to their testimony, the Court granted defense counsel's motion for a sequestration order under N.C. Rule of Evidence 615. The second witness, Peter Bull, was excused from the courtroom while the first, Jesper Vork, testified. Following Mr. Vork's testimony, the Court took a brief recess, during which plaintiff's counsel, Mark Ash, encountered Mr. Bull in the hallway. Mr. Ash handed Mr. Bull some documents that were discussed during Mr. Vork's cross-examination and suggested, "You should take a look at these." Giving a sequestered witness documents he had not seen before and which had been used in the questioning of the prior witness was improper.

[8] Clearly, the parties could reach such a result by settlement. (Alternatively, he could transfer to Jill her pro rata share of his stock which was debt free.) Such a settlement would remove any windfall to Mr. Boisvert and leave the Company to be managed by its directors in the best interests of all the shareholders and the other constituents (such as employees) interested in the welfare of the company. The company would get back the stock issued by it. Neither Mr. Boisvert nor anyone else who benefited from the reduction in his debt approved under false pretenses would be rewarded.